Mary NEWCOMB, Appellant,
[per Rule 84.05(e) ]

v.

HUMANSVILLE R–IV SCHOOL DISTRICT, Respondent.

No. 20017.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 19, 1995.

Motion for Rehearing or Transfer Denied Oct. 11, 1995.

Application to Transfer Denied Nov. 21, 1995.

William A.R. Dalton, Daniel, Clampett, Lilley, Dalton, Powell & Cunningham, Springfield, for appellant.

Ransom A. Ellis, III, Laura J. Johnson, Ellis, Ellis & Black, Springfield, for respondent.

SHRUM, Chief Judge.

This case arises under the Teacher Tenure Act, §§ 168.102–.130, RSMo 1994 (the Act).[1]

Mary Newcomb was a permanent teacher as defined by § 168.104(4), holding an indefinite contract[2] with Humansville R–IV School District (District).[3] District sought to terminate its contract with Newcomb on the ground of "[i]ncompetency [or] inefficiency ... in line of duty." § 168.114.1(3). After a hearing, as provided for by § 168.118, District's Board of Education (Board) terminated Newcomb's contract based upon its finding of her continued incompetency and inefficiency during the curative period. § 168.116.2.

Newcomb appealed to the Circuit Court of Polk County. That court reversed the Board's decision and ordered it to reinstate Newcomb. District appeals from that judgment.

Because she was the party aggrieved by the Board's decision, Newcomb filed "the appellant's brief and reply brief" as required by Rule 84.05(e).[4] Newcomb presents four points to support her contention that the Board erred and that the judgment of the trial court should be affirmed: (I) Board's decision to terminate Newcomb's contract is based on findings that are not supported by competent and substantial evidence; (II) District's warning letter lacked the detail and specificity required by the Act; (III) District did not, during the postwarning period, "meet and confer" with Newcomb about her alleged teaching deficiencies as mandated by the Act; and (IV) Board did not afford Newcomb a fair and impartial hearing free of actual bias and prejudice.

We disagree and reverse and remand with directions to the trial court to reinstate the decision of the Board.

The essential facts are as follows:

Newcomb was a teacher for seventeen years and employed by the District for fifteen years. Generally, she taught elementary classes, although she taught junior high in 1991–92. In 1993–94, she taught District's only third grade class. District's principal, Sandy Wessel (Wessel), evaluated Newcomb's teaching performance during both the 1992–93 and 1993–94 school years.

In a letter dated March 18, 1994, Newcomb was notified by District's superintendent that charges of incompetency, inefficiency, and insubordination might be filed against her if the causes set forth in the letter were not corrected within thirty days of the letter.[5] On May 17, 1994, District's superintendent filed charges of incompetency and inefficiency.[6] A notice of hearing was filed with the charges as prescribed by § 168.116.3. Newcomb timely requested a hearing before the Board. A full hearing was conducted in which Newcomb was repre-

1. All statutory references are to Revised Missouri Statutes 1994, unless otherwise indicated.

2. See § 168.106.

3. As applicable to Newcomb, § 168.104(4), RSMo 1994, defines "permanent teacher" as "any teacher who has been employed ... as a teacher in the same school district for five successive years...."

4. Effective January 1, 1994, Rule 84.05(e) provides:
"If the circuit court reverses a decision of an administrative agency and the appellate court reviews the decision of the agency rather than of the circuit court, the party aggrieved by the agency decision shall file the appellant's brief and reply brief, if any, and serve them within the time otherwise required for the appellant to serve briefs. The party aggrieved by the circuit court decision shall prepare the respondent's brief and serve it in a time otherwise required for the respondent to serve briefs."

5. Such letter notice is prescribed by § 168.116.2.

6. Such filing of charges is prescribed by § 168.116.1.

sented by counsel and afforded the opportunity to cross-examine witnesses and present all evidence that she deemed applicable. Following the hearing, the Board entered its decision, which was supported by extensive findings of fact and conclusions of law. By a unanimous vote, the Board terminated Newcomb's teaching contract. Newcomb then presented the matter to the Circuit Court of Polk County for review. The trial court entered its judgment reversing Board's decision and ordered reinstatement of Newcomb as a permanent teacher and the payment of past benefits and compensation. This appeal followed.

■ In Newcomb's first point, she contends that in terminating her contract the Board acted "contrary to law, in that the overwhelming weight of the evidence failed to establish that ... Newcomb was incompetent or inefficient and the Board's decision to terminate her employment was without sufficient evidentiary support." Because Newcomb's argument in support of Point I appears to have three parts, we discuss each separately.

One theory of error in Newcomb's first point, as we comprehend it, is that the Board ascribed a wrong definition or legal standard to the terms "incompetency" and "inefficiency" in reaching its decision. In developing this argument, Newcomb recognizes that the Act does not define the terms incompetency or inefficiency. She also concedes that several cases have judicially defined the scope of these terms to mean the inability " 'to perform ... professional teaching duties in a manner acceptable to the Board.' " *Artherton v. Board of Education of the School District of St. Joseph,* 744 S.W.2d 518, 522 (Mo.App.1988) (quoting *Birdwell v. Hazelwood School District,* 352 F.Supp. 613, 626[22] (E.D.Mo.1972), *aff'd* 491 F.2d 490 (8th Cir.1974)). For more recent applications of the *Artherton* definition of incompetency, *see Johnson v. Francis Howell R–3 Board of Education,* 868 S.W.2d 191, 197 (Mo.App.1994), and *Beck v. James,* 793 S.W.2d 416, 418 (Mo.App.1990).

Nevertheless, Newcomb argues that the foregoing cases do not state the legal standard that should be applied in her case. She avers that during the 1993–94 school year, District created "the conditions which [rendered her unable] to perform her professional teaching duties," and thus "led to the warning letter, and ... charges." To support this assertion, Newcomb points to evidence that the third grade class assigned to her for 1993–94 had thirty-two students (composed of twenty-six boys and six girls), ranging in age from eight to nine years, and of the thirty-two pupils at least seven were "special needs" children. Additionally, she refers to evidence that school administrators were frequently in her room observing and that on several occasions a video camera was set up in her classroom.

Without further elaboration and without pointing to other evidence to support her claim, Newcomb concludes "[t]here were many disruptions intentionally caused by the administration. All of these factors led to a status of disorder." With that as her premise, Newcomb suggests that "the definition of incompetency adopted by the Court in *Artherton* is not necessarily controlling when, as here, the ability to perform the teacher's professional teaching duties during the one year in question was dictated by conditions not within control of the teacher."

We are not persuaded that District "created conditions" that led to the "status of disorder" in Newcomb's class or that it intentionally . caused disruptions in her classroom. District assigned Newcomb to teach the third grade class in accordance with her choice. Before District made classroom assignments for the 1993–94 year, Wessel asked Newcomb what class she could be most effective with and have the best chance to improve. Newcomb chose the third grade, saying she had taught that grade level for many years. Wessel expressed concerns about Newcomb's choice, telling her that a former teacher of those students had been "very unit and theme oriented" and if Newcomb kept her usual teaching style, the students might not adapt well. Nevertheless, Newcomb insisted and received the assignment she requested. Since there was only one third grade class in the school, obviously, District did not create the condition of twenty-six boys and only six girls in the class. Likewise, District did not

single out Newcomb's classroom to be the only one to have educationally disabled children. Wessel testified there were educationally disabled children "in all of our rooms [in the 1993–94 school year]."

As to the school administrators and video cameras in Newcomb's room, they were present as part of a Professional Development Plan agreed to by Newcomb and District administrators. Video taping occurred on only three occasions. From our review of the videotapes, we conclude that the camera caused only a small portion of the disorder and chaos shown. Moreover, we have carefully read the two-volume, 660–page transcript and examined the exhibits pertinent to Newcomb's first point. Having done so, we agree with Newcomb's frank admission that there was a "status of disorder" in her classroom during the 1993–94 school year. We do not, however, find evidentiary support for her claim that many of the disruptions were "intentionally caused by the administration."

■ Finally, we note that Newcomb cites no authority to support her claim that her competency and efficiency as a teacher should be measured by a legal standard other than that defined in *Artherton* and its progeny.[7] Not surprisingly, we find no authority to support her contention either. As her argument lacks both legal and evidentiary support, we reject it.

Turning to the second argument found in Point I, Newcomb also charges that Board did not comply with § 168.114.2 when it considered the evidence. In part, § 168.114.2 provides:

"In determining the professional competency of or efficiency of a permanent teacher, consideration should be given to regular and special evaluation reports prepared in accordance with the policy of the employing school...."

*Id.*

Newcomb asserts that for fourteen years the District rated her skill and competence as a teacher as satisfactory according to her annual "Summative Evaluation Reports." Therefore, she insists her termination by the Board for incompetency and inefficiency is contradicted by its own records from earlier years, which assessed her performance favorably. From that premise, Newcomb urges us to find that the Board never considered her annual Summative Evaluation Reports. She makes such request without pointing to evidence or developing a theory to support such a claim. We reject her argument as illogical and without evidentiary support.

■ Indeed, Newcomb's annual evaluations for the years 1981 through 1994 were placed in evidence. As a reviewing court, we assume the Board considered all the evidence when it rendered its decision. *See Cofer v. Price–Cofer*, 825 S.W.2d 369, 375[9] (Mo.App. 1992). Moreover, *Nevels v. Board of Education of School District of Maplewood–Richmond Heights*, 822 S.W.2d 898 (Mo.App. 1991), explains that Board was not required to make its decision about Newcomb's competency and efficiency in 1993–94 based solely on her performance evaluations in prior years. *Id.* at 905. Achieving tenure does not ensure that a teacher will be eternally competent and efficient in the teaching profession. The legislature implicitly recognized that fact when it included "[i]ncompetency [or] inefficiency ... in line of duty" as one of the six causes for which a school board can terminate a permanent teacher's contract. § 168.114.1(3). To the extent that Newcomb intends to argue to the contrary in Point I, we reject her argument.

We also note that although Newcomb relies heavily on her Summative Evaluation Reports done before 1993–94 as evidence of continued competency and efficiency, she ignores substantial evidence of District's concerns with her performance in recent years, especially in the areas of classroom management and student discipline. For example, District's evaluation of Newcomb for 1988–89 recorded that "[maintaining] students on the learning task" was an area that "could be

---

7. In so stating, we do not ignore Newcomb's citations to *Conder v. Board of Directors of Windsor School*, 567 S.W.2d 377 (Mo.App.1978). Although *Conder* does refer to a definition of incompetency drawn from Black's Law Dictionary, the Eastern District has, in more recent cases, approved and applied the *Artherton* definition of incompetency. *See Johnson*, 868 S.W.2d at 197; *Beck*, 793 S.W.2d at 418.

strengthened." For the 1989–90 year, when Newcomb taught a third grade class, District found that she met performance expectations, yet, in six areas of that evaluation the principal wrote this comment: "Improvement needed to handle difficult classes; Spend time/effort needed to be prepared and diplomatic." In her testimony before the Board, Newcomb admitted that because of her problems with classroom management, she did not get "career ladder money" for 1989–90, i.e., extra pay. Moreover, she was sufficiently dissatisfied with the contents of her 1990–91 report to request a reassessment.

Newcomb's 1991–92 assignment was to teach junior high classes under the supervision of principal Janice Hogan (Hogan). After observing Newcomb's seventh grade science class on November 8, 1991, Hogan recorded that Newcomb should "[w]ork on being consistent in [her] discipline." She also discussed her observations directly with Newcomb. Hogan prepared another "Formative Observation Form" in March 1992 in which she recorded her observations of Newcomb's eighth grade science class. Again, Hogan discussed her evaluation with Newcomb. On the form, Hogan reported:

> "The class was never settled down so better use of instructional time could be used.
>
> " . . . .
>
> "Disruptive behavior is not corrected constructively. Students continued same disruptive behavior after being corrected by teacher.
>
> " . . . .
>
> "Your 4th hour class was out of control. They talked without permission. They were out of their seats. Student learning is hampered severly [sic] in such an environment."

Hogan's March 1992 report led to the preparation of a Professional Development Plan to be followed by Newcomb. Its intended purpose was to improve Newcomb's performance in classroom management and management of student behavior.

On May 13, 1992, Hogan and Newcomb entered into a second Professional Development Plan on classroom management which Hogan described as an "enrichment activity" for Newcomb "drawing attention that she still needed to be concerned about managing student behavior in a constructive manner."

When Hogan prepared Newcomb's Summative Evaluation Report in May 1992, she recorded that Newcomb had the performance expectation of "[managing] student behavior in a constructive manner" but with a "minus" and with the comment that she should "[k]eep on working on classroom management."

District assigned Newcomb to teach a fourth-fifth grade split class for the 1992–93 school year under the supervision of principal Wessel. Wessel observed Newcomb's classroom on several occasions during the school year. During each of her observations, Wessel would "script," i.e., would "[write] down as much . . . of everything said . . . as verbatim as you can." Using her "scripting" and personal observations, Wessel prepared an evaluation on a "Formative Observation Form" for her November 5, 1993, visit. On that form she wrote the following:

> "[Newcomb] allows for too much talking out. I tallied over 50 instances in the lesson and didn't get them all. Verbal correction was given, but no discipline mark was given.
>
> " . . . .
>
> "I believe [Newcomb] is a knowledgeable teacher. My concern is with the classroom management aspect of her teaching. The talking out and lack of control in the room is at a level I feel is distracting to the teaching going on."

Wessel testified that when she and Newcomb discussed this evaluation, Newcomb "recognized that those problems were there." When asked about Newcomb's response to the evaluation, Wessel testified: "I don't recall . . . Newcomb ever saying to me in any of our visits, 'That's not so. I don't see that.' She's always admitted the problems were there." During Wessel's other visits to Newcomb's classroom in 1992–93, she recorded incidents of students talking out, not working, and poor classroom management.

On December 21, 1992, Wessel prepared a Professional Development Plan which Newcomb agreed to. It was designed to improve

Newcomb's "below-expected performance" and her "[m]anagement of student behavior." The stated objective of the plan called for Newcomb to use "techniques (e.g., social approval, contingent activities, punishment, [keeping] students on Task, etc.) to maintain appropriate behavior." A seven-step procedure for achieving the objectives was part of the plan. Wessel then assessed Newcomb's headway by making classroom visits and holding conferences with her. In March 1993, Wessel concluded that although Newcomb had progressed under the plan, she had not achieved all of its objectives. As part of her written evaluation, Wessel wrote:

"I feel the best progress can be forthcoming next fall w/a new group and better planning. It would be my suggestion Mrs. Newcomb work closely, early in the year with the new administrator and get off to a solid start."

In explaining that evaluation, Newcomb testified:

"My thinking was that perhaps when we started this plan in December, bad habits were ingrained and it was harder to overcome that, so we would see what happened in a whole new year."

With that background, Wessel tempered Newcomb's May 1993 Summative Evaluation Report with the following comment:

"While I have definite concerns on classroom management, we have consulted on a [Professional Development Plan] and progress has been made. There is still room for growth & improvement and we will work on it the next weeks [sic]. However[,] because there has never been marked below performance level & because I'm first year evaluator & reluctant to take that step at this time."

To the extent that Newcomb attempts to say that her competency and teaching skills were never questioned in prior years, thus raising an inference or presumption that Board ignored her earlier evaluations, the foregoing evidence dispels that claim. Newcomb's claim that the Board, in making its decision, failed to consider her prior evaluations is without evidentiary support. We reject it.

For her final contention under Point I, Newcomb argues that "[t]he Findings of Fact as to what happened in the third grade classroom at Humansville during the curative period do not show . . . Newcomb was incompetent or inefficient so as to cause her indefinite teaching contract to be terminated." Consequently, says Newcomb, Board's decision is not supported by competent and substantial evidence.

The curative period here was eight weeks, from March 17, 1994 (the date Newcomb received the warning letter), to May 17, 1994 (the date Newcomb received the Statement of Charges). At the hearing, Wessel testified that during the curative period, she attended Newcomb's room six times. Also, Hogan testified that she was in Newcomb's class twice during that period. They observed several incidents of the same type as deficiencies itemized in the warning letter, i.e., inability by Newcomb to control student behavior and to keep students applied to assigned tasks. The Board's findings concerning Wessel's and Hogan's observations during the curative period are attached as Appendix "A."

In her brief, Newcomb does not challenge Board's findings about what the District's administrators saw in her classroom during the curative period nor does she contend that the problems did not exist. Instead, she contends that the cause of the observed "status of disorder" lay elsewhere and not with her, i.e., resulted from the size of the class, gender-mix (twenty-six boys, six girls), and the presence in her class of "mentally disturbed" children.

Newcomb insists that the Board, in reaching its decision, failed to acknowledge that the foregoing were the reasons why the students were talking out and "why certain activity not conducive to a learning experience was occurring." In summary, Newcomb takes the position that it was classroom conditions over which she had no control that "dictated the decorum of the classroom." With that as her premise, Newcomb avers the Board's findings that she was to blame and was incompetent and insufficient is not supported by the evidence.

In presenting this argument, Newcomb recognizes what our standard of review is. In this regard, we quote from her brief:

"[W]e acknowledge judicial review in this ... case [is] limited to a determination of whether the Board's decision is supported by competent and substantial evidence upon the whole record, whether it is arbitrary, capricious or unreasonable, or whether it constitutes an abuse of discretion. *Ross v. Robb*, 662 S.W.2d 257, 259 (Mo. banc 1983). We also understand the Court of Appeals will view the evidence in the light most favorable to the Board's decision. *Gamble v. Hoffman*, 732 S.W.2d 890, 892 (Mo. banc 1987). It is also acknowledged where evidence before a Board of Education in a Teacher Tenure Act case warrants either of two opposed findings, a reviewing court is bound by the Board's determination, and it is irrelevant that there is evidence to support a contrary finding. *Nevels v. Board of Education*, 822 S.W.2d 898 (Mo.App.1991). The Board also receives the benefit of any doubt about the veracity of witnesses, as the appellate courts defer to the Board's determination of credibility of witnesses."

As stated earlier, we have carefully read this record in its entirety, including transcripts and exhibits. After considering all evidence under the applicable standard of review, we conclude that the Board's finding that Newcomb did not, during the curative period, improve her competency and efficiency to a level acceptable to Board is supported by competent and substantial evidence. We reject Newcomb's arguments to the contrary. It was the Board's prerogative to determine the level of competency and efficiency required of teachers in the District. *Keesee v. Meadow Heights R–II School District*, 865 S.W.2d 818, 823 (Mo.App.1993). Point I is denied.

■ In her second point, Newcomb challenges the sufficiency of the warning letter. She contends that the "warning letter was inconsistent, misleading in part, overbroad and told [Newcomb] so much it did not tell her anything." Additionally, she avers that the warning letter "failed to state causes for

termination that could have been removed by [Newcomb]" during the curative period.

District's warning letter to Newcomb (sans caption, page headings, and signature) is Appendix "B" to this opinion.

■ The first step in the statutory procedure for removal of a permanent teacher on the grounds of incompetency or inefficiency is a written warning specifically stating causes which, if not removed within a probationary period of at least thirty days, may result in charges. § 168.116.2; *Johnson*, 868 S.W.2d at 195[8]. The main purpose of the warning letter is to give the teacher an opportunity to know exactly what the complaints are against him or her and afford them a chance to cure the situation. *Artherton*, 744 S.W.2d at 521.

■ We are not required to undertake our review of Newcomb's complaints about the warning letter in a vacuum. *O'Connell v. School District of Springfield R–12*, 830 S.W.2d 410, 413 (Mo. banc 1992). Here, as in *O'Connell*, the warning letter was written, only after a lengthy and detailed process of evaluation in which Newcomb received numerous evaluations echoing the same deficiencies raised in the warning letter. In the 1993–94 school year, Newcomb signed onto numerous professional development plans. The warning letter makes specific reference to these plans. Also, the record is replete with testimony and documentary evidence that Newcomb's teaching problems, especially in the areas of instructional process, classroom management, and interpersonal relationships, continued in the fall and winter months of 1993–94 despite repeated evaluations, conferences, and attempts by the District to help Newcomb. We find the following language from *O'Connell* to be apropos:

"The facts of the present case in summary portray a teacher with long-term problems who underwent a sequence of detailed evaluations leading to the warning letter. All of the evaluations and commentary were made available to appellant, and she was engaged in conferences with numerous assistance personnel throughout. The significance of the fact that the terminology in the warning letter mirrored that

used in all previous evaluations cannot be understated. The very process of evaluation undertaken by the district served to avoid the problem of insufficient notice that Sec. 168.116.2 is designed to address.

"Under the facts and circumstances of this case none of the deficiencies listed was susceptible to such a wide variety of interpretations as to violate the general prohibition against proceedings to terminate a teacher upon non-informative allegations. *Blue Springs Reorganized School Dist. IV*, 499 S.W.2d at 36. Appellant did not find herself 'struggling blindly toward undefined and unknown standards of conduct,' *Pollard*, 533 S.W.2d at 670, but instead was informed in every step of the process by evaluations, reports and conferences." *Id.* at 416.

We hold that the warning letter to Newcomb meets the specificity requirements of § 168.116. *See Cozad v. Crane School District R–3*, 716 S.W.2d 408, 411[1] (Mo.App. 1986). The letter containing the general causes of incompetency and inefficiency, the specific causes, terminology taken from previous evaluations, references to professional development plans, and references to previous discussions afforded Newcomb the necessary statutory warning. *See Iven v. Hazelwood School District*, 710 S.W.2d 462, 464–65[4] (Mo.App.1986).

In reaching our conclusion, we do not ignore Newcomb's complaint that the warning letter was misleading because it mentioned "insubordination" as a general cause but never stated a single specific instance of insubordination. However, Newcomb never develops this argument. She fails to demonstrate that she was misled by the presence of the word "insubordination" in the letter. Moreover, we cannot perceive how she might have been misled as she was not charged with or terminated for insubordination. At most, it appears that the general insubordination term was in the warning letter because it is a part of § 168.114.1(3). We are not persuaded that inclusion of the general term "insubordination" either precluded Newcomb from knowing exactly what the complaints were against her or interfered with her chance to cure the situation considering the specificity

of the causes in the remainder of the letter. We reject this argument.

Additionally, we have considered Newcomb's contention that she received contradictory direction in the warning letter concerning her teaching technique. Specifically, she argues that the letter recommended that she use lecture as a teaching technique but later criticized that she relied "too heavily upon lecture." That argument is not factually supported. When fairly and reasonably read, the letter can only be interpreted as telling Newcomb that she fell short in her teaching skills by not using a variety of "effective teaching techniques" and in overusing lecture as a teaching mode. By mentioning "lecture" as one of several techniques recommended to Newcomb for use in conjunction with others, the letter is not contradictory in its message. We reject Newcomb's argument to the contrary.

Finally, we note Newcomb's contention that the warning letter was faulty because it stated—as causes for her termination—conditions which she could not remove during the curative period. Her argument in this regard is merely her Point I restated, i.e., that the deficiencies listed in the warning letter regarding classroom management were not her fault but rather the fault of the administration and students. Thus, Newcomb insists that in the curative period she "had no chance at all to instill discipline [considering] the nature and character of the students, the presence of other adults in the classroom, the presence of ... Wessel in and out, scripting for all she was worth, and the irresistible temptation [for the students] to do 'monkey shines' [sic] in the presence of the video camera." Such arguments go to the sufficiency of the evidence to support Board's decision, rather than to the adequacy of the warning letter. We reject Newcomb's second point.

■ In her third point, Newcomb contends that District was without authority to terminate her contract because it made no meaningful effort during the curative period to meet and confer with Newcomb in an effort to resolve the matter. She points out—correctly so—that the "meet and confer" requirement is the second procedural

step required by § 168.116(2).[8] *See Johnson*, 868 S.W.2d at 195. This step contemplates that school administrators must make a good faith effort to give the teacher a chance to remedy the defects enumerated in the warning letter. *See Blue Springs Reorganized School District IV v. Landuyt*, 499 S.W.2d 33, 37 (Mo.App.1973).

Here, District's warning letter to Newcomb designated Wessel as the superintendent's representative. Newcomb asserts that neither Wessel nor the superintendent did anything during the curative period to help solve her problems. Newcomb acknowledges that Wessel and other administrative staff visited her class during the curative period but claims they did so only trying to substantiate that she was deficient in the areas listed in the warning letter, and thus build a case for the bringing of charges and a termination hearing. She makes this latter argument without directing us to evidence that supports her claim.

On the other hand, Wessel's testimony concerning her efforts to aid Newcomb during the curative period includes the following. On six different days during the curative period, Wessel sat in on Newcomb's room for periods of twenty-five to forty-five minutes to observe and evaluate what she saw. Additionally, Hogan (the junior-high principal) made two classroom observations during that period. "The purposes of the evaluation [via scripting] were to keep going over them ... with Mrs. Newcomb, in an effort to seek improvement and correction." Meetings between Newcomb and Wessel were scheduled each Tuesday so that they might talk about Newcomb's performance and the deficiencies listed in the warning letter. Wessel explained: "[W]e set a specific date so that every week we would get together, go over the scriptings, I could make suggestions. We had things that we were following up on ... for the purpose of improvement."

Regarding meetings for which she had records, Wessel testified as follows. On March 23, 1994, she and Newcomb discussed another teacher's reaction to a videotape of Newcomb's classroom. That discussion stemmed from a Wessel–Newcomb meeting on March 15, 1994, in which Wessel suggested that Newcomb show a videotape of her classroom to a teacher that Newcomb trusted for purposes of getting another opinion. In Wessel's words, "I was concerned that if [Newcomb] felt like my expectations were wrong or too high or that I was picking on her that she wouldn't be able to make a good change, that she could ... take [the videotape] to someone that she trusted and get another opinion and maybe the suggestions coming from someone else would make more of an impression." Thus, in the March 23 meeting, Wessel asked Newcomb if she had shown the videotape to another teacher and if so, to whom. Newcomb answered that she and a Mrs. Hickman had watched the tape together and Mrs. Hickman had "suggested wait time and not talking over [the students], waiting until they were quiet." Also, in the March 23 meeting, they talked about Newcomb observing Hickman's class and about a group project that Newcomb had assigned to her class.

On March 29, Newcomb and Wessel "looked over lesson plans," talked about how Newcomb was doing literature sets, discussed the possible use of different seating arrangements for students, and discussed specific problem students. Also, Wessel talked with Newcomb about watching on the videotape "for her consistency in class."

In an April 19 meeting, Wessel talked with Newcomb about a complaint from a parent. She read Hogan's scripting notes to Newcomb and discussed with her the many student interruptions during her attempt to conduct a reading group. Wessel suggested to Newcomb certain things she might do to cut down on student interruptions during group reading. Wessel then asked Newcomb if she needed anything from her, to which she answered, "No."

On April 26, 1994, Wessel read to Newcomb her notes of an April 22 classroom

---

8. In pertinent part, § 168.116.2 provides: "[After] warning in writing [is given to the teacher] stating specifically the causes which, if not removed, may result in charges ..., both the superintendent, or his designated representative, and the teacher shall meet and confer in an effort to resolve the matter."

observation. They looked at Newcomb's lesson plans and discussed the next "scripting" session. Wessel also inquired why Newcomb had not entered any of her students in the Language Arts fair as the other classes had. Newcomb answered that it was not her thing, and that few of her students would probably ever write professionally.

In early May 1994, Wessel and Newcomb discussed Wessel's observations and scripting done on April 28, 1994.

As Wessel testified, after the warning letter, she and Newcomb worked "continually" on the professional development plans of October 1993 as revised in February 1994. In the curative period, Wessel made suggestions to Newcomb "anytime [she] could think of them at the weekly meetings." Wessel testified that she "wanted to do everything [she] could to help [Newcomb]." Although Newcomb attended workshops during the curative period, Wessel saw no changes in the classroom as a result of such attendance. At one of the Wessel–Newcomb conferences, Wessel directly asked Newcomb whether she had used any of the workshop information. According to Wessel, Newcomb answered that "she didn't feel like she had or she couldn't think of any."

Both Wessel and District's superintendent, Douglas Wright, testified that on April 6, 1994, they had met with Newcomb and the local CTSA president and had conferred with them concerning the deficiencies noted in the warning letter to Newcomb. Wright summarized the April 6 meeting thusly: "We talked about corrective action, the recommendations that Mrs. Wessel had made for corrective action...."

We are persuaded by the foregoing evidence as well as the case authority discussed below that the intent and purpose of the "meet and confer" requirement of § 168.116.2 was met in this case. For example, *Nevels*, 822 S.W.2d 898, is factually similar. There, as here, the superintendent met with the teacher to explain the significance of the warning letter. *Id.* at 904[10]. An outside expert and the principal observed the teacher's classroom on several occasions and reviewed their observations with him. *Id.* A school counselor assisted the teacher with quarterly progress reports and a school secretary reviewed with him the procedure for preparing attendance reports. *Id.* at 904–05[11]. The *Nevels* court concluded that such evidence reelected a good faith effort by the school administration to assist the teacher to remedy his shortcomings and satisfied the meet and confer requirement of § 168.116.2. *Id.* at 904–05.

In *Merideth v. Board of Education of Rockwood R–6 School District*, 513 S.W.2d 740 (Mo.App.1974), a teacher argued that the meet and confer provision of the Act required the superintendent "to make every effort to resolve the difficulty." *Id.* at 750. The teacher's claim was that "some affirmative action was required, and that the meetings which took place only worsened the situation." The Eastern District rejected that argument.

"Mr. Dunn, the [district's] building principal, testified that he met with [the teacher] during the first quarter of the 1972/73 year in an effort to resolve the matter. More specifically, a conference was held on September 14, 1972, which was devoted to a discussion of the deficiencies indicated in the July 10th letter, as well as the areas mentioned in the March 10, 1972 evaluation report. Dunn also testified to numerous discussions with the respondent at which time he made attempts to help her. *Furthermore, the record reflects that most of the complaints in the July 10th warning were not new to the teacher; there had been discussions and attempts by [principal] to help [the teacher] during the prior school year, even going so far as having [the teacher] transferred to Bowles School where Mr. Dunn was principal because of his familiarity with [the teacher's] problems.* Based on the record, we believe the efforts by Mr. Dunn did comply with the requirements that the superintendent or his designated representative and [the teacher] 'meet and confer in an effort to resolve the matter.'"

*Id.* at 750 (emphasis ours).

Here, Newcomb argues that during the curative period, Wessel did not offer "constructive help," a contention similar to the

one rejected in *Merideth*. Specifically she complains that Wessel did not make changes in student assignments to the class, institute a new professional development plan, or enlist the aid of other adults in the classroom. District responds—correctly so—that neither § 168.116 nor case law interpreting that provision required District to take such steps to satisfy the meet and confer requirement. Furthermore, it is significant that most of the complaints reflected in the warning letter were not new to Newcomb. *Merideth*, 513 S.W.2d at 750. It is uncontroverted that there were discussions and attempts by Wessel to help Newcomb during the prior school year. There was evidence that these efforts and discussions continued throughout the 1993–94 school year, with the District even going so far as giving Newcomb her choice of teaching assignments for that year. Based on the record, we hold that the efforts by Wessel and other District personnel during the curative period did satisfy the "meet and confer" requirements of § 168.116.2. We reject Point III.[9]

■■■ We reproduce Newcomb's fourth and final point in its entirety.

"The termination of Mary Newcomb, a tenured teacher, was contrary to law in that Mary Newcomb was deprived of her right to a fair and impartial hearing and ruling."

As suggested by District in its brief, Newcomb's fourth point on appeal does not conform to Rule 84.04(d) and, therefore, preserves nothing for review. The requirements of Rule 84.04(d) include:

"The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous...."

"The three components of a point relied on are (1) a concise statement of the challenged ruling of the trial court, (2) the rule of law which the court should have applied, and (3)

the evidentiary basis upon which the asserted rule is applicable." *Hoffman v. Koehler*, 757 S.W.2d 289, 292[2] (Mo.App.1988). For another articulation of the *wherein* requirement, *see Estate of Goslee*, 807 S.W.2d 552 (Mo.App.1991), where we observed that the *wherein* portion of a point relied on should advise the court and the opposing party of the way in which the trial court misapplied controlling principles of law or misconstrued the facts. *Id.* at 556.

■■■ Compliance with Rule 84.04(d) is discussed at length in *Thummel v. King*, 570 S.W.2d 679 (Mo. banc 1978); *Midwest Materials Company v. Village Development Company*, 806 S.W.2d 477, 483 n. 1 (Mo.App. 1991); and numerous other Missouri appellate court opinions. Points that do not comply with Rule 84.04(d) preserve nothing for review. *See Keesee*, 865 S.W.2d 818, 823–24 (Mo.App.1993); *In re Marriage of McCoy*, 818 S.W.2d 322, 325[3] (Mo.App.1991). Here, Newcomb's fourth point does not state "wherein" she was deprived of her right to a fair and impartial hearing and ruling. As District has asserted, Newcomb's fourth point preserves nothing for review.

■■■ Despite such infirmity, we may look to the argument portion of the brief to determine if there was plain error which would permit relief under Rule 84.13(c). *McCoy*, 818 S.W.2d at 325[3]. With respect to Newcomb's fourth point, we find no error, plain or otherwise.

We reverse and remand with directions to the Circuit Court that it order reinstatement of the Board's decision.

CROW and PARRISH, JJ., concur.

APPENDIX "A"

"53. On March 18, 1994, Ms. Wessel observed Ms. Newcomb's classroom. During that observation, Ms. Wessel observed the following:

---

9. We have considered cases cited by Newcomb and find them factually distinguishable. In *Iven*, 710 S.W.2d 462, the superintendent's designated representative met with the teacher once to discuss his performance during an eleven-month curative period. *Id.* at 464–65. In *Blue Springs*,

499 S.W.2d 33, the teacher initiated the only meeting during which the principal failed to mention the administration's two main complaints about the teacher's performance. *Id.* at 37.

a. When she entered the room, a student was sitting with his head down and his coat over his head because he was mad about the confusion over where he was supposed to be.

b. One student was allowed to say to another student without correction, "Move your big head. I can't see."

c. Several students were talking and laughing during the instruction period.

d. Students were out of their seats during the lesson.

e. Students failed to line up properly and gathered around other students' desks without permission.

f. There were numerous instances of talking out by students and verbal corrections by Ms. Newcomb during the observation. (Exhibit 49).

(Exhibits 49 and 49a).

54. Ms. Wessel met with Ms. Newcomb to discuss Ms. Newcomb's progress and efforts towards improvement of her performance on March 23, 1994, March 29, 1994, April 6, 1994, and April 19, 1994. (Exhibits 50, 52 and 55).

55. On March 25, 1994, Ms. Wessel observed Ms. Newcomb's classroom. During that observation, Ms. Wessel noted:

a. The students were generally off task during the instruction. Ms. Newcomb had to place a paper in front of one student, throw another student's paper away, proceed to a third student's desk to tell her to straighten up and get a sheet of paper and get ready. One student was sitting folding up a fan with her paper as the teacher read the next set of instructions. Another student sat staring out of the window.

b. Several students failed to participate in checking their lessons and were talking during the lesson.

c. A student was told by Ms. Newcomb to, "Get your head up."

d. Ms. Newcomb announced it was time for a science lesson and one student yelled out without correction, "Ooooh, yuck."

e. Two students were fighting, twisting each other's arms without correction.

f. Students were allowed to yell at other students without correction.

g. Three arguments occurred between students without correction and four students were sent to the hall.

h. Ms. Newcomb made at least thirty-two corrections to student misconduct. (Exhibit 51).

56. On April 6, 1994, Ms. Wessel observed Ms. Newcomb's classroom. During that observation, Ms. Wessel made the following observations:

a. Seventeen students had been kept in from recess for various disciplinary problems including note passing and talking.

b. When the lesson began, only nine students had their assignment ready at the beginning of class and the class time was used to let the rest of the students catch up.

c. Many student talked despite Ms. Newcomb's attempts to correct the conduct.

d. Ms. Newcomb was forced to ask the class to stop talking in order to give students an opportunity to do late work.

e. Students interrupted the lesson eleven times and kept talking despite at least eight verbal commands by Ms. Newcomb to stop.

f. The lesson consisted of grading an assigned worksheet. (Exhibit 53).

57. On April 7, 1994, Ms. Hogan was asked to observe Ms. Newcomb's class. During that observation, Ms. Hogan observed the following:

a. The students' behavior was generally disruptive. Students were talking out without permission and some students were out of their seats.

b. Students were hitting each other and not doing the assignment.

c. During the approximately thirty minute observation, Ms. Newcomb told the class or individual students to be quiet at least seven times.

d. Students were allowed to talk out without correction.

(Exhibit 62).

58. During her observation of April 7, 1994, Ms. Hogan made the following written observation:

Observations of the class were that the class was generally disruptive. Ms. Newcomb attempted numerous times to quiet the class using verbal commands and non-verbal techniques such as turning out the lights. However, students seemed to pay little, if any, attention to her instructions. Her lesson would have been good had the general unruliness of the class been absent. She tried to incorporate cooperative learning as well as hands-on activity for the students. She never had the full attention of the entire class because students were talking or up out of their seats.

(Exhibit 62).

59. On April 14, 1994, Ms. Wessel observed Ms. Newcomb's class. During that observation, Ms. Wessel noted:

a. A student entered the classroom acting like he was driving a race car without correction by Ms. Newcomb.

b. Students are generally off task, talking with one another, and tipping in their chairs.

c. Two students were observed tipped back in their chairs at their desks.

d. A student was observed making drum noises on his desk with his fingers.

e. Ms. Newcomb handed out a workbook telling the students simply to do pages 61–64.

f. Several students talked while the lesson was going on despite Ms. Newcomb's demands for quiet.

g. Three students sat at their desks for more than fifteen minutes without working and without correction from Ms. Newcomb.

(Exhibit 54).

60. On April 22, 1994, Ms. Wessel observed Ms. Newcomb's classroom. During that observation, she noted the following:

a. Students were generally talking during the lesson despite Ms. Newcomb's demands for quiet.

b. One student refused to take her seat until Ms. Newcomb physically turned her toward her seat. The student was out of her seat again shortly thereafter.

c. Two students argued loudly without correction.

d. While Ms. Newcomb is doing examples on the blackboard, many students do not look up and watch. Other students did not do the page which was assigned.

e. Ms. Newcomb placed one student in the corner for talking and he made faces at the class.

f. Ms. Newcomb instructed one student to approach her desk three times before he did so.

g. One student put his head down and refused to do the work on his own.

h. During the thirty minute observation, Ms. Newcomb gave forty-six verbal corrections to be quiet, to sit down or to follow instructions to the class.

i. Ms. Newcomb discouraged a student who had done work which was not assigned.

(Exhibit 56).

61. On April 28, 1994, Ms. Wessel observed Ms. Newcomb's classroom. During that observation, Ms. Wessel observed the following:

a. Ms. Newcomb wanted to allow the students to work in pairs but the class would not cooperate with her.

b. Two students entered the classroom hopping.

c. Two students argued over a book and were sent to the hall. When they returned, they reentered the classroom laughing.

d. One student talked out during the lesson. with her nose pinched causing the other students to laugh. Students are generally out of their seats during the lesson not paying attention to the lesson.

e. Students are generally talking, talking out loud and turned around in their seats not listening or attempting to listen

to the lesson, despite Ms. Newcomb's demands for quiet.

f. The class consisted of filling out worksheets together.

g. One student was allowed to state, without correction, that it was alright to throw rocks at cars.

h. Students are generally allowed to talk out loud during the lesson, including making gun noises, making statements like, "You have a four-wheeler?"

i. During the one hour observation, Ms. Newcomb made over forty corrections to classroom disruptions.

(Exhibit 57).

62. On April 29, 1994, Ms. Hogan observed Ms. Newcomb's class. During that observation, Ms. Hogan observed the following:

a. Ms. Newcomb had the following exchange with her class:

Ms. Newcomb: "I won't read anymore. You're not listening."

Class: "Yes we are."

Ms. Newcomb: "No you're not."

b. The classroom lesson consisted of filling out worksheets together.

c. A student had to be moved to the front of the room because the student was complaining about another student panting like a dog.

d. A student asked to go to the restroom. Ms. Newcomb told him he could not go. The student said, "If I pee my pants, it will be your fault." Ms. Newcomb continued to say no. The student argued, "Yes, it will be your fault because you won't let me go to the restroom."

e. As Ms. Hogan started to leave the room, a student yelled, "Ms. Hogan, Ms. Hogan ..." The student named another student and said the student "said you were ugly." Ms. Newcomb replied to the student that "some things are better not repeated."

(Exhibit 63).

63. Ms. Hogan's observation concluded as follows:

"Ms. Newcomb is trying to use several methods to control the class' behavior— several students in from recess, writing students' names on board who misbehave or continue to talk, turning lights out to get their attention, taking minutes off recess, sending students to the hall.... **However,** students continue to be disruptive and have little or no respect for the teacher or her instructions."

(Exhibit 63).

### APPENDIX "B"

"This letter constitutes your warning under § 168.116, RSMo. stating the specific causes which if not removed may result in charges of incompetency, inefficiency or insubordination in the line of duty. Such charges could result in the termination of your indefinite contract.

It is my intention that the remedial period during which you will have an opportunity to address these problems will extend until the end of the current school year. However, it is possible that charges may be brought at any time after the expiration of the first thirty days if satisfactory improvement is not shown in all areas identified. It is also possible that the remedial period may be extended into the following school year.

The following items of incompetency, inefficiency and insubordination must be addressed:

### INSTRUCTIONAL PROCESS

1. You have failed to demonstrate effective use of teaching techniques, strategies, and skills. You have not used a variety of effective teaching techniques appropriate to the maturity level and needs of your students and the particular subject matter you are teaching, which should include lecturing, modeling, demonstrating, questioning, experimentation and role playing. You have not assigned a variety of activities which require the application of the skills and concepts taught. You have failed to consistently use guided and independent practices. You have not consistently stated the learning objectives to students at the beginning of each lesson and reinforced the concepts learned

through closure at the end of the lesson. You have wasted classroom instructional time on student grading of work. You rely too heavily upon lecture and worksheets as your primary teaching techniques. All of these problems have been brought to your attention in the past and have been incorporated into your professional development plans.

2. You have failed to use instructional time effectively. Observations have demonstrated that you have failed to maintain students in your class on learning tasks. By observation, you have failed to continue leaning activities for the duration of the scheduled instructional time and have simply had the students put their heads on their desks. Because of the classroom management problems discussed below, you have been unable to avoid unnecessary delays during your lessons and inappropriate digressions from the topic of the lesson.

3. You have failed to demonstrate the ability to motivate students. Students on a regular and routine basis do not participate in instructional activities in your classroom. For example, students have been observed during instructional time just sitting at their desks and not working; sitting at desk combing hair; yawning and not paying attention to the instruction being given; sitting at their desks with their heads down; playing at desk and not working; talking with other students; reading a book when supposed to be working on assignment; making animal noises; playing with pill bottle; moving around in the room and laughing; staring out the window; and playing with erasers. There are many other instances of observed activity to indicate that you have failed to motivate the children in your class. These have previously been discussed with you and have been the subject of your professional development plans.

In addition, you have failed to respond positively to students' requests for help, failed to respond quickly to students who have had their hands raised. You have refused to help a student with work which not actually assigned, but which the student thought had been assigned. You have responded inappropriately when asked by a student to help spell a word. You have refused to help a behaviorally disordered student read a problem with which he was having difficulty. Other instances of this type of failure to motivate students have been discussed with you previously and have been a part of your professional development plans.

CLASSROOM MANAGEMENT

4. You have failed to organize your classroom environment to promote learning. You have failed to establish and communicate clear parameters for student classroom behavior. By observation students have stated that you never do anything but give them checkmarks. You respond to some students who come to your desk without raising their hands for permission while sending other students back to their seats to raise their hands. On one activity you instructed students to sit in their seats and you would call them up to your desk to observe the results of an experiment. Yet, you recognized several students who came to your desk without you first directing them and you allowed them to view the results of the experiment. By observation the students in your class do not know when it is appropriate to talk out loud and when it is not. They do not get consistent correction from you as to when they may and may not talk out loud. While you have used methods such as flipping the lights on and off and withholding leaving the class for special activities, the students do not seem to understand what you expect from them when you perform these actions. Students do not know when it is appropriate for them to be out of their seats. You are not consistent in correcting the students who are out of their seats when they are not supposed to be.

In addition, you have failed to insure that materials and information can be read, seen and/or heard by the students in your class. By observation you have had 13 students try to crowd around a table to participate in an activity when there was not sufficient room for that number of students. On another occasion you wrote a list on the board too low. A student shouted out that he could not see the list.

These matters have previously been discussed with you and made part of your professional development plans.

5. You have failed to manage student behavior in a constructive manner. You have failed to maintain learner behavior that promotes the possibilities of learning for the class. By observation a student in your class was heard to repeatedly call another student a "baby", to which the other student shouted a reply "Why don't you shut up?" Neither student was corrected by you. You have failed to require the class to remain in their seats unless they have permission to be out of their seats. You have failed to require students to comply with your requests regarding classroom behavior. By observation you have had to end a lesson early and have the students sit at their desks with their heads down until school was dismissed because you could not manage their behavior in your classroom. Students in your class have been observed pushing and hitting other students, shouting out during tests and lessons, and looking up another student's dress, all without any correction from you. Two students from your room were observed lying in the hall and when an inquiry was made they replied, "It's too noise in the room." One student was observed to be sliding on the floor as he entered your room, without correction from you.

You have failed to promote the students' self-control. Students have been observed repeatedly playing with items during class when they should have been participating in the lesson. When you direct the class to stop talking, they continue talking. By observation students engage in attention getting behavior without intervention by you. Examples include students burping, playing footsie, yelling out in class, pretending to trip and fall and falling out of their chairs. Students have also repeatedly been observed talking to each other instead of participating in the lesson.

While it is appropriate to overlook inconsequential behavior, you have consistently failed to constructively correct disruptive behavior. Students repeatedly yell out from their seats. Whether these shoutings are related to the lesson or not they are disruptive to the class. You have on numerous occasions completely failed to correct this behavior. On one occasion when you attempted to correct this behavior you were observed telling one student that another student has a problem with talking. This is not a constructive method for correcting this type of behavior.

You punished a student by making him pick up the floor during a math test. This is not a constructive method of correcting behavior. Some of your professional developments plans have been directed specifically to improve this area. Little or no improvement has been observed.

## INTERPERSONAL RELATIONSHIPS

6. You have failed to demonstrate positive interpersonal relations with students. You have failed to interact with students in a mutually respectful and friendly manner. You have been observed to instruct a student to clean up his table in the lunch room in an unfriendly manner and without making eye contact with the student. You have been heard to tell a student to "get that grin off your face." You have been observed using a tense voice level with the students. From across the classroom you have told a student, "I don't want you distracting other people—you constantly do that and it has to stop!" A student who was behind on getting her work turned in was asked by you, "how do you expect to get it done?—organize yourself!" Yet, you failed to give her any helpful hints on how to "organize." A student asked to take work home and your response was, "well, you weren't doing it here." This has been discussed with you previously and has been incorporated into your professional development plans.

7. You have failed to demonstrate positive interpersonal relations with parents. Parents have repeatedly raised concerns about the lack of discipline in your classroom. You have failed to alleviate their concerns and to

reassure them about the discipline in their child's classroom.

## PROFESSIONAL RESPONSIBILITIES

8. You have failed to demonstrate a sense of professional responsibility. You failed to timely turn in student discipline plans and curriculum plans as directed by the Principal.

Specific examples given in this letter of problems are for illustrative and instructional purposes only and are not meant to be a[n] exhaustive list of all facts supporting each and every area of deficiency.

I am appointing Mrs. Wessel as my representative in an effort to assist you in overcoming these problems. If you have ideas concerning how the district can assist you in overcoming these problems, please share them with Mrs. Wessel. We will attempt to accommodate your reasonable requests. Please make an appointment with Mrs. Wessel as soon as possible in order to provide input to her as she attempts to implement a plan to assist you."