**Tony Egbuna FORD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 71760.**

Court of Criminal Appeals of Texas, En Banc.

Feb. 21, 1996.

Rehearing Denied April 3, 1996.

Norbert J. Garney, El Paso, for appellant.

John L. Davis and Karen L. Landinger, Asst. Dist. Attys., El Paso, Robert A. Huttash, State's Atty., Austin, for the State.

## OPINION

OVERSTREET, Judge.

In a four count indictment, appellant was charged with one count of capital murder committed during the course of robbery and three counts of attempted capital murder committed during the course of robbery, all alleged to have been committed on or about December 18, 1991 in El Paso County. In July of 1993, appellant was convicted in the 346th District Court of El Paso County of capital murder and of the three counts of attempted capital murder. During the punishment phase the jury affirmatively answered the special issues set forth in Article 37.071, § 2(b)(1)(2), V.A.C.C.P., and negatively answered the special issue set forth in Article 37.071, § 2(e), V.A.C.C.P., whereupon the trial court sentenced appellant to death.[1] Direct appeal of that death sentence is automatic. Article 37.071, § 2(h), V.A.C.C.P. On direct appeal, appellant raises five points of error.

Appellant does not challenge the sufficiency of the evidence at guilt/innocence. However, he does challenge the sufficiency of the evidence to support the jury's affirmative answer to the first special issue. We will first address that point challenging the jury's answer to the future dangerousness special issue, i.e. whether there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society.

## I.

### SUFFICIENCY OF THE EVIDENCE AT PUNISHMENT

In appellant's first point of error, he contends that the evidence was insufficient for the jury to return an affirmative answer to the question of future dangerousness. The record reflects that on the evening of December 18, 1991, appellant and a cohort forced their way into the home of a mother with three of her adult children and proceeded to rob them. The decedent, his mother, and one sister were shot. Another sister was shot at, but missed. The decedent died from the gunshot wound to the back of his head. The following is a more detailed recitation of the evidence adduced at trial.

On December 18, 1991 the Murillo family attended a Christmas play to see their cousin perform. At the conclusion of the play the family departed to their mother's, Myra Concepcion Murillo's, home for a quick dinner. The mother and her three children, Myra Magdalena, Armando and Lisa, all planned to do some Christmas shopping later that evening. After dinner, Armando was in the family room watching television, Myra Magdalena was readying herself in her bedroom for her shopping trip, and Lisa was in the kitchen. Their mother called out to her children at some point to inquire if any had heard the two men who had knocked at the door. The two men were apparently looking for the "man of the house" and the mother had refused to permit their entrance. After the children informed her they had heard nothing, each returned to his or her previous task.

Moments later Myra Magdalena stepped out into the hallway to encourage her family to hurry up. At that moment, she saw her mother and her brother retreating from the doorway. Her mother was backing up as if

---

1. The jury assessed punishment of three concurrent life sentences for the three attempted capital murder convictions. Appellant's appeal of those three cases was dismissed for want of jurisdiction, due to failing to timely file notices of appeal, in an unpublished opinion by the El Paso Court of Appeals. *Ford v. State*, No. 08–93–00430–CR (Tex.App.—El Paso, delivered May 25, 1995, no pet.).

she was in fear of her life, kind of crouching down, and her brother looked as if he had been hit in the head and just huddled straight into the corner. She testified that within a few seconds, she saw appellant standing to her right, next to her at the entry to her bedroom. Subsequently she saw his cohort. She testified that they both had guns. Lisa testified that she "heard a barging in, just a lot of noise, racket, like somebody kicking wood." She saw two strangers in the hallway with guns. Appellant's cohort pointed a gun at Lisa and walked her into the den area.

Appellant and his cohort ordered the four individuals to kneel on the floor and to be quiet. The Murillo's began to pray. Appellant first demanded money, then jewelry. Throughout these demands, appellant would yell and threaten the family, occasionally pausing to strike Armando with the gun. Recognizing appellant's cohort as "a very familiar face in the neighborhood," Myra Magdalena attempted to divert her gaze away from the cohort to prevent being recognized. The four continued to pray as they were asked to remove their jewelry. Finally, appellant asked for the keys to the car parked outside. When Myra Magdalena hesitated in releasing her automobile keys, her sister retrieved them and awkwardly threw them towards appellant. The keys skinned his face and hit the wall. Myra Magdalena testified that appellant's response was, "[F]uck you, just for that, I was just going to blow him. Now I'm just going to fucking blow you all[.]" She testified that appellant then began shooting.

Appellant shot Armando in the back of the head. Myra Concepcion, upon seeing her son shot, jumped up to comfort Armando. Appellant hooked his arm around her and shot her on the right side of the head. Myra Magdalena testified that appellant had to curve his gun around to aim it properly at her mother's head before he shot her. Upon being shot in the head at point blank range, Myra Concepcion fell to the floor. Myra Magdalena believed she would be next. As appellant stepped toward her, Myra Magdalena rose and pushed him. The gun discharged and she fell to the ground pretending to be hit. The bullet had missed her. Another shot went off and she heard her sister "gulp." After the robbers left, Myra Magdalena got up and phoned for help. Armando died from the gunshot wound. The others survived. Appellant was identified as doing the shooting, and as being dominating, doing the most talking and giving the most orders.

Appellant testified at guilt/innocence and at punishment. He steadfastly denied participating in the home invasion and shooting, but rather insisted that he had remained outside, initially sitting in the vehicle but then getting out, while two associates entered the home and committed the offense. He maintained that he did not shoot or kill anybody.

At punishment, neither the State nor appellant presented any psychiatric or psychological testimony. The State did not present any evidence of prior criminal record, unadjudicated offenses, or bad character.[2] The State only presented testimony from the decedent's father, mother, and two sisters. They testified about the effect that the decedent's death and the others' injuries was

2. The record contains an exhibit marked as Defendant's Exhibit 4, which is a "Stipulation" signed by the two prosecutors, two attorneys representing appellant, appellant himself, and the trial judge. It states:

> Now come the State of Texas, defendant and defense counsel, and agree and stipulate to the following:
> The defendant, Tony Ford, has never been convicted of a felony in this State, or any other State, or against the laws of the United States.

Though it does not appear that this exhibit was ever offered or received into evidence, at the conclusion of punishment testimony prior to formally resting, one of appellant's attorneys stated that the defense and the State had entered into an oral stipulation of evidence. That attorney then announced a stipulation which comported with the above-quoted written stipulation. When the trial court asked, one of the prosecutors stated that that stipulation had not yet been reduced to writing, whereupon appellant's attorney agreed. The trial court then informed the jury of the meaning of stipulated evidence, i.e. that which is not contradicted or controverted by either side, and indicated that it would have such reduced to writing and signed by the attorneys for the State and defense and by the defendant, and then it would be approved by the trial court.

having on them. The State also presented exhibits, which were medical records of the two shooting survivors.

Appellant's mother testified that appellant was born on June 19, 1973, making him 18–years–old at the time of the offense. Appellant also presented testimony from his sister, and three family friends who had known him for a number of years. They indicated that appellant previously had not exhibited any violence or acts of aggression, and opined that he would follow the rules and regulations of prison society, would take advantage of rehabilitation opportunities, and would not be a future danger if incarcerated for life. Appellant himself testified at punishment and indicated that he could follow prison rules and regulations if incarcerated for life. He also cried on cross-examination, stating that he would not want what had happened to the Murillo's to happen to anybody, and acknowledging that he also felt bad that he was facing a possible death penalty. He added that "[e]verybody is a victim in this case[,]" including in some instances himself in that he did not agree with the jury's verdict because he did not do anything wrong besides sitting outside in the truck.

 In determining the sufficiency of the jury's answer to the special issue concerning future dangerousness, the evidence must be viewed in the light most favorable to the jury's answer. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Johnson v. State,* 853 S.W.2d 527, 532 (Tex.Cr.App.1992), *cert. denied,* — U.S. ——, 114 S.Ct. 154, 126 L.Ed.2d 115 (1993). This Court has often cited numerous factors a jury may consider when determining the answer to that special issue. These factors include, but are not limited to:

1. The circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;

2. The calculated nature of the defendant's acts;

3. The forethought and deliberateness exhibited by the crime's execution;

4. The existence of a prior criminal record, and the severity of the prior crimes;

5. The defendant's age and personal circumstances at the time of the offense;

6. Whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

7. Psychiatric evidence; and

8. Character evidence.

*See, e.g., Johnson,* 853 S.W.2d at 532; *Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Cr.App. 1987). The evidence in this case, however, was generally limited to the offense itself. Nevertheless, as we noted in *Johnson,* "No killing exists in a vacuum. The circumstances of the offense, and the events surrounding it may provide greater probative value than any other evidence regarding the probability of future acts of violence." *Johnson,* 853 S.W.2d at 532.

 In the instant cause, several factors are initially noteworthy. Appellant took the stand during both phases of the trial. During guilt/innocence, he denied participation of the shooting and placed the blame on two other individuals. He insisted that they went inside the house and committed the numerous acts of violence while he remained uninvolved outside. As discussed above, appellant testified at punishment and continued to deny involvement, in spite of the jury's guilty verdict. A jury could believe that appellant's testimony illustrated a lack of remorse for the taking of the decedent's life and the damage he caused to his mother and sister.

However, the most telling evidence during the guilt phase of the trial was the evidence of appellant's statement just before he killed the decedent. While the family prayed and the mother plead for their lives, testimony indicated that appellant demanded the keys to the car in front of the house, and that when Lisa threw the keys to him and accidently hit him, appellant became enraged and said, "[F]uck you, just for that, I was just going to blow him. Now I'm just going to fucking blow you all[.]" This statement demonstrates two disturbing factors. First, the statement depicts a premeditated intention to kill the decedent or the man of the house *before* he had ever entered the house. Second, it portrays a callous disregard for the value of human life. Apparently, appel-

lant believed that killing more people than he had initially intended would be an appropriate response to Lisa's action in hitting him with the car keys. Appellant's actions illustrate a disturbing escalation of violence. Appellant's response to accidentally having been hit by the keys was to decide to *kill* the rest of the family. Members of the family were on their knees as appellant attempted to take their lives. Appellant's disregard for human life is also illustrated by his actions in grabbing the mother as she lunged to help her dying son. As she prayed for his life, appellant seized her head and deliberately positioned the weapon at her head and fired.

Remorselessness and disregard for human life have been considered in determining the sufficiency of the evidence to support a jury finding of probability of committing criminal acts of violence that would constitute a continuing threat to society. *See, e.g., Heiselbetz v. State,* 906 S.W.2d 500, 507 (Tex.Cr. App.1995); *Allridge v. State,* 850 S.W.2d 471, 488–89 (Tex.Cr.App.1991), *cert. denied,* — U.S. ——, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993); *Williams v. State,* 668 S.W.2d 692, 696 (Tex.Cr.App.1983), *cert. denied,* 466 U.S. 954, 104 S.Ct. 2161, 80 L.Ed.2d 545 (1984); and *Crawford v. State,* 617 S.W.2d 925, 933 (Tex.Cr.App.1980), *cert. denied,* 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 431 (1981). We conclude that the evidence of appellant's lack of remorse, refusal to accept responsibility for his actions, attempt to place the blame upon others, and specific actions at the Murillo home were sufficient for a rational jury to determine that there was a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. Appellant's first point of error is overruled.

## II.

### VICTIM IMPACT EVIDENCE

In his third point of error, appellant claims, "The trial court erred in allowing 'victim impact' testimony into evidence during the punishment phase of [his] trial." The trial court permitted the survivors of the shootings, and the decedent's father, to testify concerning their injuries and the effect of the incident upon their lives.

Myra Magdalena was questioned, over a continuing objection based upon relevancy and Rule 403 as to any and all impact evidence, about how she felt about strangers after the instant offense. She testified about how close she and her deceased brother had been, like best friends, who had attended high school together and shared common interests. She also testified about her mother as being "forever in a wheelchair" and had to be taken care of by her like a child; i.e. that their roles were reversed, with her being 21–years–old and having a child of her own.

Lisa then testified. When asked what her physical reminders are, she said that every day she sees where the bullet went through her and feels the bullet, which was not removed because it was too dangerous to take out all the pieces surrounding her lung. She also testified about how her mother is a totally different person, being dependent upon a wheelchair, daily medicine for the rest of her life, and other people to bath, dress, and cook for her—"She depends on everybody for everything." Lisa also testified that she herself hates the night, i.e. that it was very scary with unfamiliar or unexpected noises, or persistent banging or knocking startling her.

After a short competency hearing outside the presence of the jury, the decedent's mother testified. Before the jury, she testified about the injuries that she received during the course of the instant offense, i.e. the gunshot wound behind her right eye, and still having a portion of her skull missing over the area where she was shot, with the bullet remaining in her brain, which affected her vision. She also testified about having been paralyzed on the left side, only having use of her left arm and having difficulty stretching her fingers out and flexing, and not being able to walk. She also testified about being unable to work, having been transformed from a businesswoman to "a disabled person[.]" She also said that because of her son being killed, she felt like she was embalmed and had a dead body and felt like she cried inside all the time, and knew that there is no end to her mourning for her son nor her grief. She added that she had been in a

coma and was unable to attend any of her son's ceremony/funeral or say goodbye to him.[3]

The father of the decedent testified about having arrived at the site of the instant offense and seeing a horrible bloody scene, with his son in the hallway, and his daughters and former wife there. He also testified at punishment about how he had been affected by his son's death:

> Well, I miss my boy a lot, and it's affected me in many ways. It's just hard to put in words, but I do miss him a lot. And due to this, you know, two men breaking in into the house, kicking in the door and coming in with guns, I guess I'm afraid. I'm afraid for myself and afraid for my family.

He also testified about how his daughters were being very brave and courageous, and how he feels sorry for them, especially at night. He concluded by stating that it was "a very horrible, horrible scene. Bloody, cold[-]blooded murder."

The State asserts that by failing to object to the testimony of Lisa and the decedent's father, appellant waived any error as to their testimony, and that by not objecting every time that that type of evidence was presented, he waived the claim even as to the testimony of the other two witnesses to whom he did object.

As noted above, when the first of the witnesses, Myra Magdalena, was questioned, appellant made a continuing objection based upon relevancy and Rule 403 as to any and all impact evidence. Specifically, appellant said, "This is obviously impact evidence that is presented at this time, and I'm objecting to any and all impact evidence." The trial court responded, "Your objection to impact evidence is overruled. You'll have a continuing objection on that. If there is something, though, that calls for another objection at another time—[interruption omitted]—raise that to the Court's attention."

Appellant did not renew his continuing objection when Lisa testified. When the decedent's mother was called to testify, appellant stated, "Your Honor, I would ask that my running objection extend to all witnesses, if they testify to the same type of matter." The trial court responded, "All right. I note your objection. I'll grant your running objection on the issue and overrule it."

■ This Court has approved the use of a continuing "running" objection; and in fact has specifically stated that there are some situations where such an objection "is not only adequate to preserve error, but actually desirable." *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex.Cr.App.1991). This Court has suggested that it would not be appropriate to allow a running objection to preserve error on a matter referred to by any witness at any during a trial. *Goodman v. State*, 701 S.W.2d 850, 863 (Tex.Cr.App.1985), *rev'd on other grounds, Ex parte Goodman*, 816 S.W.2d 383 (Tex.Cr.App.1991). Nevertheless, while this Court has included cautionary admonitions about making running objections, the use of running objections fits within the purview of Tex.R.App.Pro. 52(a)'s requirement of timely and specific trial objections to preserve appellate complaints. As this Court stated in *Sattiewhite v. State*, 786 S.W.2d 271, 283 (Tex.Cr.App.1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 226, 112 L.Ed.2d 181 (1990), "[t]he purpose of lodging a timely and specific objection is to inform the trial court of the basis of the objection and to give the court an opportunity to rule on the specific objection as the evidence is introduced." "[A]s long as the running objection constituted a timely objection, stating the specific grounds for the ruling, the movement desired the court to make … [,] then the error should be deemed preserved by an appellate court." *Id.* at 284–85 n. 4. This Court also opined that "there are situations where a running objection, made with the express permission of the trial judge" much more appropriately contributes to the orderly flow of trial than does a redundant and disruptive series of individual objections. *Id.* The record reflects that appellant was clearly objecting "to any and all impact evi-

---

3. Appellant in particular complains of the testimony of the decedent's mother, specifically based upon the prejudicial effect of her physical impairments upon the jury. She entered the courtroom in a wheelchair and was unable to stand on both legs. He further complains that during her testimony she began crying, apparently leading to a juror's crying.

dence" as "to all witnesses" testifying to such. The trial court clearly understood such complaint and ruled adversely thereon. We conclude that appellant has preserved his claim for appellate review.

Appellant claims that the testimony was not relevant to any issue at punishment, or if relevant its probative value was substantially outweighed by its danger of unfair prejudice. *See* Tex.R.Crim.Evid. 402 and 403. We will address each argument in turn.

■ Article 37.071, § 2(a), V.A.C.C.P., provides that "evidence may be presented by the [S]tate and the defendant or the defendant's counsel as to any matter that the court deems relevant to sentence[.]" *See Mayo v. State,* 708 S.W.2d 854, 858 (Tex.Cr.App.1986). A trial court at the penalty stage of a capital murder trial has wide discretion in admitting or excluding evidence. *Lane v. State,* 822 S.W.2d 35, 41 (Tex.Cr.App.1991), *cert. denied,* 504 U.S. 920, 112 S.Ct. 1968, 118 L.Ed.2d 568 (1992); *Briddle v. State,* 742 S.W.2d 379, 391 (Tex.Cr.App.1987), *cert. denied,* 488 U.S. 986, 109 S.Ct. 543, 102 L.Ed.2d 573 (1988).

In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court addressed the scope and relevance of so-called victim impact evidence. The Court noted that it was "now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id.,* 501 U.S. at 825, 111 S.Ct. at 2608, 115 L.Ed.2d at 735. It stated that with regard to the harm that the killing had caused, "there is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant." *Id.* 501 U.S. at 826, 111 S.Ct. at 2609, 115 L.Ed.2d at 736.

*Payne* specifically held "that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* "A State may legitimately conclude that evidence about the victim and about the impact of the murder on

the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* "There is no reason to treat such evidence differently than other relevant evidence is treated." *Id.*

As we stated earlier, Article 37.071, § 2(a), V.A.C.C.P., provides that evidence may be presented by the litigants "as to any matter that the court deems relevant to sentence[.]" We also observe that the State is permitted to present jury argument for appellant to receive a sentence of death. Art. 37.071, § 2(a), V.A.C.C.P.

Appellant acknowledges that victim impact testimony may be allowed under *Payne,* but insists that since such admissibility is couched in terms of relevance, such evidence is inadmissible because it is irrelevant to the special issues. He asserts that "[s]uch evidence can in no way assist the jury in answering any special issue." Specifically as to the special issues, he insists that "whether the victim is saint or sinner, the victim's spiritual status can in no way assist a jury in determining whether an accused would commit future criminal acts of violence[,]" and that "a victim's spirituality can in no way assist a jury in determining whether appellant actually caused the deceased's death or that he intended to kill the deceased or another, or that he anticipated that a human life would be taken." He adds that "the goodness or badness of a victim is not a proper circumstance in determining the personal, moral culpability of the defendant[,]" and questions whether he should "be damned for killing a saint, while canonized for eliminating a sinner?"

We observe that the term "victim impact evidence" does not appear in the Texas Rules of Criminal Evidence. Our Rules do provide that relevant evidence is generally admissible, while evidence which is not relevant is inadmissible. Tex.R.Crim.Evid. 402. As quoted above, the U.S. Supreme Court has held that in a capital punishment setting, "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed[,]"

and that "[t]here is no reason to treat such evidence differently than other relevant evidence is treated." *Payne, supra.* As noted above, Art. 37.071, § 2(a), V.A.C.C.P., provides that the State may present evidence "as to any matter that the court deems relevant to sentence" and present jury argument for the defendant to receive a sentence of death. Thus, our Texas statutory procedures provide for the admissibility of evidence "relevant to sentence[.]"

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R.Crim.Evid. 401. At sentencing, pursuant to Art. 37.071 the jury in the instant cause had to answer the statutory special issues which asked:

Is there a probability that the defendant, Tony Ford, would commit criminal acts of violence that would consititue [sic] a continuing threat to society?

Do you find from the evidence beyond a reasonable doubt that Tony Ford, the defendant himself, actually caused the death of Armando Murillo, Jr., the deceased, on the occasion in question, or if he did not actually cause deceased's death, that he intended to kill the deceased or another, or that he anticipated that a human life would be taken?

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

The jury was also instructed per Article 37.071, § 2(f)(4), V.A.C.C.P., that "mitigating evidence is evidence that a juror might regard as reducing the defendant's moral blameworthiness."

 Questions of relevance should be left largely to the trial court, and will not be reversed absent an abuse of discretion. *Moreno v. State,* 858 S.W.2d 453, 463 (Tex. Cr.App.1993), *cert. denied,* — U.S. —, 114

S.Ct. 445, 126 L.Ed.2d 378 (1993) and — U.S. —, 114 S.Ct. 1389, 128 L.Ed.2d 63 (1994). In reviewing a trial court's relevancy decision via the abuse of discretion standard, as long as the trial court's ruling was at least within the zone of reasonable disagreement, we will not intercede. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Cr.App.1990) (op. on reh'g). We must determine whether in the instant cause, the trial court abused its discretion in determining that the testimony of the decedent's mother, father, and sisters was "relevant to sentence[.]"

In *Miller–El v. State,* 782 S.W.2d 892, 896 (Tex.Cr.App.1990), in a non-death penalty situation, this Court held that evidence of the degree of injury, even extending into the future, was admissible at punishment because such evidence bore on the defendant's moral blameworthiness. In that case, this Court specifically noted that the injury actually caused to one of the complainants, paralysis, did not outrun the defendant's moral culpability, thus the defendant was blameworthy. *Id.* at 897.

*Stavinoha v. State,* 808 S.W.2d 76 (Tex.Cr. App.1991), also a non-death penalty situation, involved evidence adduced at punishment about the aggravated sexual assault's psychological aftereffects on the child complainant and on his mother. We concluded that such evidence "had a bearing on [the defendant's] personal responsibility and his moral guilt," and was therefore admissible. *Id.* at 79.

 In the instant cause, the jury was required to answer a special issue which asked about appellant's "personal moral culpability[.]" In answering that issue, the jury's instructions included language about evidence affecting appellant's "moral blameworthiness." Thus, appellant's moral blameworthiness and culpability was definitely at issue at punishment. *See, e.g., Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

Based upon the particular testimony-at-issue admitted into evidence at punishment in the instant cause, we are unable to conclude that the trial court abused its discretion in concluding that such testimony was relevant to the punishment issues. In this

particular case, we conclude that the trial court's decision to admit such testimony, presumably as "relevant to sentence," was at least within the zone of reasonable disagreement.

■ Appellant also asserts that even if the testimony was even remotely relevant regarding the special issues, the trial court nevertheless abused its discretion in admitting such testimony over his Rule 403 objection. Appellant argues that "such a sight and testimony from a surviving crippled victim could only serve to have a prejudicial effect on the jury, thereby outweighing any probable value it may have in assisting the jury in determining the special issues." Apparently, appellant is suggesting that a witness who has been crippled during the course of the offense at bar should not be allowed to testify.

Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." After reviewing the record, we cannot conclude that the trial court abused its discretion in concluding that such testimony's probative value was not substantially outweighed by the danger of unfair prejudice. *Montgomery v. State*, 810 S.W.2d at 391–93. Accordingly, appellant's third point of error is overruled.

### III.

### *JURY SELECTION*

In his second point of error, appellant asserts that the trial court erred in not allowing him to voir dire the veniremembers regarding the minimum time appellant would have to serve before being eligible for parole. We note that appellant did not make or request to make a bill of exceptions as to what questions he would have asked if he had been allowed. Such a procedure might be useful in determining whether the trial court abused its discretion. We also note that appellant did not make a constitutional (federal or state) deprivation argument, and in fact seemed to agree with the trial court's

tentative decision to include the 35–year parole eligibility instruction in the punishment jury charge but to "keep away from it in voir dire."

As is permissible, the trial court instructed the jury that the minimum time appellant would serve before being eligible for parole was 35 years.[4] However, the litigants were not able to voir dire the potential jurors concerning this subject. Appellant argues that because he had the right to the instruction concerning parole, he should have been able to ask proper questions concerning parole. *See Lane v. State*, 828 S.W.2d 764, 766 (Tex.Cr.App.1982) (defendant was not permitted to question potential juror upon definition of reasonable doubt).

■ We must determine whether the trial court abused its discretion and improperly limited appellant's voir dire. *Woolridge v. State*, 827 S.W.2d 900, 904 (Tex.Cr.App. 1992); *Nunfio v. State*, 808 S.W.2d 482, 484 (Tex.Cr.App.1991). The propriety of the question to be asked is generally determinative of the issue. *Woolridge*, 827 S.W.2d at 904; *Nunfio*, 808 S.W.2d at 484. A question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Woolridge*, 827 S.W.2d at 904; *Nunfio*, 808 S.W.2d at 484. Generally, however, parole is not a proper consideration for the jury in a capital case. *Smith v. State*, 898 S.W.2d 838, 846–53 (Tex.Cr.App.1995) (plurality opinion) (Overstreet, J., dissenting). Appellant would have been permitted to inquire of potential jurors whether they could ignore parole consequences in their deliberations. *Smith*, 898 S.W.2d at 852–53; and cases cited therein. Questions concerning the actual number of years, however, are not a proper area of inquiry for veniremembers. Accordingly, the trial court did not abuse its discretion in so limiting appellant's voir dire. The second point of error is overruled.

### IV.

### *GUILT/INNOCENCE*

■ In his fourth point of error, appellant argues that the trial court failed to

---

**4.** Although the court did consider appellant's motion to instruct the jury upon the minimum number of years prior to voir dire, the court did

not rule on that motion until after appellant was found guilty.

suppress the in-court identification of him by the Murillo sisters, Lisa and Myra Magdalena. Appellant asserts his in-court identification was tainted by an improper pre-trial identification procedure. In *Webb v. State,* this Court addressed the nature of pre-trial identification procedures.

A pretrial identification procedure may be so unnecessarily suggestive and conducive to mistaken identification that to use that identification at trial would deny the accused due process of law. *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). However, it is the "substantial likelihood of misidentification" that may be engendered by such suggestive procedure that works the deprivation. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Thus, if the totality of the circumstances reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure, subsequent identification testimony will be deemed "reliable," "reliability [being] the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

To be weighed against the corrupting effect of any suggestive identification procedure in assessing reliability under the totality of the circumstances are the following nonexclusive factors: "The opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id.,* 432 U.S. at 114, 97 S.Ct. at 2253, 53 L.Ed.2d at 154.

Of course, a finding that a challenged pretrial identification procedure was not in fact impermissibly suggestive will obviate the need to assay whether under the circumstances it created a substantial likelihood of misidentification. *Williams v. State,* 675 S.W.2d 754, 757 (Tex.Cr.App. 1984).

*Webb v. State,* 760 S.W.2d 263, 269 (Tex.Cr. App.1988), *cert. denied,* 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989).

Myra Murillo picked appellant's photograph in a photographic line-up on December 19, 1991. Her sister, Lisa, likewise selected appellant approximately one week later. Appellant asserts the pretrial identification procedure was impermissible based upon the comparison of the description of the perpetrator given by Myra at the time of the offense and appellant's appearance at trial. Appellant's assertion does not indicate that the photographic line-up was somehow impermissibly suggestive, but rather he argues that the individual the sisters identified is not the individual who committed the offense. Absent a showing that the photographic line-up was impermissibly suggestive, the identification procedure used by the police does not violate appellant's due process rights. Appellant's fourth point of error is overruled.

In appellant's fifth point of error, he argues that the trial court erred in failing to suppress a photograph of appellant wearing a long dark coat. The photograph was admitted as State's exhibit four. Appellant was arrested wearing a long dark coat, similar in description to a coat identified by the eyewitnesses. After his arrest, appellant was photographed wearing the coat. Appellant asserts that his arrest was illegal and therefore the fruits of that illegal seizure, the photograph of the coat, should be suppressed. However, it appears that appellant has waived his claim of error.

"An objection to photographic evidence is waived if the same information contained in the photograph is conveyed to the jury in some other form." *Havard v. State,* 800 S.W.2d 195, 205 (Tex.Cr.App.1989); *Hughes v. State,* 878 S.W.2d 142, 155 (Tex. Cr.App.1992) (opinion on rehearing), *cert. denied,* —— U.S. ——, 114 S.Ct. 2184, 128 L.Ed.2d 902 (1994). Without objection the arresting officer testified that appellant was taken into custody in a long dark coat, the coat itself was admitted into evidence, and the defendant himself testified that he was photographed wearing a long dark coat and that the admitted coat was similar in appearance to his. This evidence is substantially

the same as the evidence contained in the photograph conveyed to the jury. Appellant has waived error. Appellant's fifth point of error is overruled.

Having reviewed all of appellant's points of error, we affirm the trial court's judgment and sentence.

BAIRD, MALONEY and MEYERS, JJ., concur with note: For the reasons stated in *Smith v. State,* 919 S.W.2d 96 (Tex.Cr.App. 1996), we believe the trial judge erred in admitting the victim impact evidence as related by the decedent's father but believe the error was harmless beyond a reasonable doubt.

MANSFIELD, Judge, concurring.

With respect to the disposition of Point of Error Number Two, this Court recently held that parole is not a proper consideration for jurors in a capital case, and therefore they do not have to be instructed as to how many calendar years an individual must serve before he becomes eligible for parole if he receives a life sentence instead of death. *Broxton v. State,* 909 S.W.2d 912 (Tex.Crim. App.1995); *Smith v. State,* 898 S.W.2d 838, 845–853 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995). Accordingly, appellant was not entitled to question venirepersons regarding the minimum amount of time appellant would have to serve before becoming eligible for parole. Appellant, furthermore, was not entitled to the instruction he did receive at the punishment phase that he would have to serve thirty-five calendar years before he would be eligible for parole though, as appellant did not object at trial and, indeed, invited the error, he cannot complain of this error on appeal. Therefore, the trial court would have abused his discretion had it *permitted* appellant to question venirepersons as to how many years appellant would have to serve before becoming eligible for parole.

With these comments, I join the opinion of the Court.

CLINTON, Judge, dissenting.

In his third point of error appellant challenges the admission of so-called "victim im-

pact" evidence at the punishment phase of his capital murder trial. The Court today holds that the particular evidence proffered in this cause is admissible because it relates to appellant's "moral blameworthiness" under Article 37.071, § 2(e), V.A.C.C.P. While I agree that the evidence was relevant to *increase* appellant's moral blameworthiness, I disagree that § 2(e) calls upon the jury to consider reasons a capital accused *should* be put to death, and thus I dissent. I write separately in order to suggest a framework for analysis that seems lacking in the opinion of the Court, and to explain why that analysis leads me to disagree with the Court's conclusion.

*I.*

The United States Supreme Court held in *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736 (1991), that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." Whether a particular state chooses to admit victim impact evidence in the course of a capital murder prosecution is, thus, purely a function of state law. That victim impact evidence does not violate the Eighth Amendment does not mean state law makes it admissible. *Payne v. Tennessee* is not dispositive. Admissibility of so-called "victim impact" evidence is governed generally by the Rules of Criminal Evidence. Tex. R.Cr.Evid., Rule 1101(d)(1).

Before we can meaningfully approach the question of admissibility of "victim impact" evidence under the rules of evidence, we must clearly define the issue. It does not facilitate the analysis to ask whether a whole category of evidence is admissible under the rubric of "victim impact." Instead, the trial court must take proffered evidence as it comes, inquiring on a case-by-case basis whether that evidence is relevant to any of the special issues in Article 37.071, which serves to circumscribe and define the parameters of the litigation at the punishment phase of a capital murder trial. Upon an objection to the relevance of any evidence that might be described as "victim impact,"

the trial court must ask, as it would of any other evidence: Does it tend to make more or less probable that any of the special issues should be answered one way or the other? Tex.R.Cr.Evid., Rules 401 & 402. If the trial court concludes it is relevant, upon further objection it may be called upon to decide: Is the probative value substantially outweighed by the danger of unfair prejudice? Tex. R.Cr.Evid., Rule 403.

The State argues that the evidence it proffered in this cause was relevant to the special issue defined in Article 37.071, § 2(e), supra, insofar as that provision places in issue "the personal moral culpability of the defendant[.]" This argument in turn raises two questions. First, exactly what does § 2(e) of Article 37.071 contemplate when it directs the jury to consider "all of the evidence, including ... the personal moral culpability of the defendant"? Secondly, does the State's "victim impact" evidence in this case have a bearing on the legislative conception of "personal moral culpability"?

## II.

### A.

Under Article 37.071, § 2(e), a jury that has already answered the first two special issues affirmatively must go on to decide:

> "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."

Before it ever reaches this issue, the jury must make a number of findings of fact against the capital defendant. First the jury must find him guilty of one of the offenses enumerated in V.T.C.A. Penal Code, § 19.03. Proceeding to the punishment phase of trial, before the defendant is susceptible to the death penalty the jury must find there is a probability he will commit criminal acts of violence that would constitute a continuing threat to society, under Article 37.071, § 2(b)(1), and that he either actually caused

the death of the deceased, or either intended or at least anticipated death, under § 2(b)(2). These are the statutory aggravating circumstances. If the jury does not find them to be true beyond a reasonable doubt, the capital defendant must be sentenced to life imprisonment. See Article 37.071, § 2(g). If—but only if—the jury *does* find the statutorily defined aggravating circumstances to exist beyond a reasonable doubt, it proceeds under § 2(e) to determine whether mitigating circumstances are "sufficient" to "warrant" life imprisonment. If mitigating circumstances are *not* sufficient, "the court shall sentence the defendant to death." § 2(g), supra.

It seems likely to me that by designating in § 2(e) that the jury consider, *inter alia,* evidence of "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant," the Legislature intended the jury to take into account only those aspects of the offense, and only those facets of the defendant's character, background and personal moral culpability, that militate in favor of a life sentence. After all, before it even reaches § 2(e), the jury has made findings of "aggravating" fact that are constitutionally sufficient to justify the imposition of the death penalty. It is clear, as borne out by the Bill Analysis accompanying Senate Bill 880, that the addition of § 2(e) to Article 37.071 was meant to accommodate the holding in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), that an adequate vehicle must be provided for the jury to effectuate the full measure of mitigating evidence. See Acts 1991, 72nd Leg., ch. 838, § 1, p. 2899, eff. Sept. 1, 1991. The jury is told to "consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." Article 37.071, § 2(f)(4). The § 2(e) issue itself specifically calls upon the jury to decide if there exist "sufficient mitigating ... circumstances to warrant" imposition of a life sentence rather than death. By contrast, the jury is never instructed that it may consider any evidence it might regard as *increasing* the defendant's moral blameworthiness. Thus, the § 2(e) issue focuses squarely on whether a death-eligible defendant should nevertheless be spared. It can well be ar-

gued that the narrowing function of Article 37.071 has been accomplished in § 2(b), and that any additional evidence why a death-eligible defendant ought to be executed, notwithstanding the mitigating circumstances, is simply not relevant to the § 2(e) inquiry. By this accounting, any proffered "victim impact" evidence that was not somehow relevant to the § 2(b) special issues would be inadmissible at the punishment phase of a capital murder trial.

On the other hand, § 2(e) does not *expressly* limit the jury's consideration solely to aspects of the crime, of the defendant's character and background, and of his personal moral culpability, that militate against a penalty of death. It might also plausibly be argued that § 2(e) contemplates that the jury should take into account *all* aspects of the crime, the defendant's character and background, and his moral culpability, non-statutory aggravating *and* mitigating, in making its "reasoned moral judgment" whether his life should be spared. *Penry v. Lynaugh,* supra, 492 U.S. at 328, 109 S.Ct. at 2952, 106 L.Ed.2d at 284. Probably such a scheme would pass constitutional muster. As long as the special issues in § 2(b) adequately serve as statutorily "narrowing" aggravators, it does not likely offend the Eighth Amendment to allow the jury also to consider non-statutory aggravating factors at the subsequent "selection" stage. See *Zant v. Stephens,* 462 U.S. 862, at 878–79, 103 S.Ct. 2733, at 2743–44, 77 L.Ed.2d 235, at 250–51 (1983); *Tuilaepa v. California,* 512 U.S. ——, at ——, 114 S.Ct. 2630, at 2638, 129 L.Ed.2d 750, at 763 (1994).[1] It is clear that the Legislature specifically intended § 2(e) to serve as a conduit for jury consideration of mitigating evidence that is not relevant to the § 2(b) special issues. Did the Legislature also intend that § 2(e) should open the door to consideration of non-statutory aggravating circumstances at the "selection" stage?[2]

---

1. I hesitate to conclude that consideration of non-statutory aggravators in Texas would *clearly* survive Eighth Amendment scrutiny. At least one reason the Supreme Court gave for approving consideration of non-statutory aggravators under the Georgia scheme in *Zant v. Stephens* was the fact that the Georgia Supreme Court is required to conduct a proportionality review of all death penalty cases on appeal. Such a review, the Supreme Court emphasized, assures that any death sentence is not arbitrarily imposed. 462 U.S. at 879 & 890, 103 S.Ct. at 2744 & 2749–50, 77 L.Ed.2d at 251 & 258. It is not entirely certain that the Supreme Court would have regarded jury consideration of non-statutory aggravators as constitutional absent this appellate proportionality review. Of course we have no such review in Texas. See *Burns v. State,* 761 S.W.2d 353 (Tex.Cr.App.1988). It is true that in *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Supreme Court declared that appellate proportionality review is not a constitutionally essential ingredient in every possible capital sentencing scheme. It remains at least open to debate, however, whether, once non-statutory aggravating circumstances are injected into our own scheme in Texas, proportionality review might become necessary to check the potential for arbitrariness inherent in the fact that jurors are authorized to "select" a death sentence on the basis of uncircumscribed aggravators. Indeed, in Texas we do not even review the jury's determination of the § 2(e) issue on appeal for simple sufficiency. See *Colella v. State,* 908 S.W.2d 834, at 845 (Tex.Cr.App. 1995).

2. Prior to the 1991 amendment to Article 37.071, which added § 2(e), the Texas capital sentencing scheme did not embrace discrete "narrowing" and "selection" stages. "Narrowing" occurred at the guilt phase of trial, where the jury determined whether the defendant committed murder of a kind, or under circumstances, that the Legislature deemed severe enough to merit his eligibility for the death penalty. Both "narrowing" and "selection" (of a sort) occurred at the punishment phase. The State simply could not execute the defendant absent a jury finding of "deliberateness" and "future dangerousness"—hence, more narrowing. Moreover, the jury was free to effectuate evidence militating against affirmative findings to the deliberateness and future dangerousness issues, by answering them "no"—hence, "selection" (of a sort). In *Penry* the Supreme Court essentially informed us that when there was evidence in mitigation of the death penalty that the jury could not effectuate under the statutory special issues, our "selection" stage failed to satisfy Eighth Amendment requisites, and had to be expanded. The legislative response to *Penry* was to add § 2(e) to Article 37.071 in 1991, thus enacting for the first time in Texas a discrete statutory "selection" stage to the capital sentencing process. What we must now decide is whether, in doing so, the Legislature directed the jury to consider not only non-statutory mitigating circumstances, but non-statutory aggravating circumstances as well. If we so decide, we would no doubt next have to decide whether such a scheme satisfies the Eighth Amendment. See n. 1, *ante.*

### B.

Two legal/historical events serve to complicate this already difficult question. First, at the time the Legislature promulgated § 2(e), the opinions of the Supreme Court in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), were still extant. These cases held that certain kinds of victim impact evidence, *viz:* evidence of the personal characteristics of the victim and the emotional impact of the crimes on his family, and surviving family members' characterizations of the crime and the defendant, were constitutionally "irrelevant." Even assuming the Legislature meant for § 2(e) to place non-statutory aggravating circumstances in issue at the "selection" stage of the punishment deliberation, it would be anomalous to presume it meant to include circumstances the Supreme Court then regarded as inadmissible under the Eighth Amendment. See V.T.C.A. Government Code, § 311.021(1). Though some of the varieties of "victim impact" evidence condemned in *Booth* and *Gathers* were subsequently deemed constitutionally acceptable in *Payne v. Tennessee,* supra, we would be hard pressed to conclude that the Legislature meant for § 2(e) to authorize their admission.

The second event that complicates the question of non-statutory aggravators is this Court's requirement that a capital defendant show a "nexus" between his proffered mitigating evidence and the offense on trial. Prior to the addition of the § 2(e) special issue, in treating a claim that certain evidence proffered in mitigation of the death penalty called for a supplemental jury instruction of some kind to satisfy *Penry,* the Court often rejected the claim on the basis that the defendant had not demonstrated a sufficient "nexus" between the proffered evidence and the particular offense he was on trial for. The Court said, for example, in *Lackey v. State,* 819 S.W.2d 111, at 134–35

(Tex.Cr.App.1989) (Opinion on appellant's motion for rehearing), that the defendant was not entitled to an additional instruction because "there is little or no connection between his background and character evidence and the facts and circumstances of his criminal acts in the instant case." Similarly, in *Goss v. State,* 826 S.W.2d 162, at 166 (Tex.Cr.App.1992), a plurality observed that "[n]one of the evidence presented ... sought to explain the apparently isolated problems of [Goss'] childhood and the commission of the crime." In a number of subsequent cases the Court has continued in this vein. E.g., *Richardson v. State,* 879 S.W.2d 874 (Tex.Cr.App.1993), and cases cited therein at 884. Most recently, in *Earhart v. State,* 877 S.W.2d 759, at 765 (Tex.Cr.App.1994), the Court explained that "a defendant must establish a nexus between the mitigating evidence and the circumstances of the offense which tend to excuse or explain the commission of the offense, suggesting that the defendant is less deserving of a death sentence."

The Court has not yet said whether this nebulous "nexus" is a prerequisite to jury consideration of mitigating evidence under the special issue in § 2(e).[3] It would not surprise me (though I would certainly disagree) were the Court to hold that jury consideration of mitigating evidence under § 2(e) was contingent upon a showing of a "connection [with] the facts and circumstances of [the] criminal acts in the instant case." *Lackey,* supra. If that were to happen, and we were also to hold that § 2(e) admits of evidence of non-statutory aggravating circumstances, another issue would, of course, arise. For we would then have to decide whether the State must show that whatever evidence of "the defendant's character and background, and [his] personal moral culpability" it proffers to persuade the jury he should receive the death penalty has a sufficient "connection [with] the facts and circumstances of [the] criminal acts" being

---

**3.** I say "jury consideration" rather than "admissibility" for a particular reason here. Evidence, of either an aggravating or mitigating nature, may well be admissible because of its relevance to one of the special issues under § 2(b). Because of the Court's nexus requirement, that same evidence may not be available to the jury for consideration in its deliberation on the § 2(e) special issue. Evidence of this kind should probably be admitted, subject to a request from the opponent for a limiting instruction under Tex. R.Cr. Evid., Rule 105(a).

tried before it can be deemed "relevant" to the § 2(e) special issue. In other words, if jury consideration of non-statutory mitigating evidence depends on a showing of "nexus," should not non-statutory aggravating evidence be likewise conditioned?

### C.

The State argues that the so-called "victim impact" evidence in this cause is relevant to appellant's "personal moral blameworthiness" under § 2(e). This can only be true if the Legislature intended for the § 2(e) special issue to be an inquiry, not only into reasons why a death-eligible capital defendant should *not* be put to death, but also into reasons why he *should*. Does the § 2(e) issue admit not only of evidence "reducing the defendant's moral blameworthiness[,]" but also of evidence *increasing* it as well?

Of course the first and best indication of legislative intent is the language of § 2(e) itself. When the meaning of a statute is plain on its face, we give effect to that plain meaning without further ado. *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Cr.App.1991). But § 2(e) does not plainly speak to whether non-statutory aggravating circumstances are to be weighed in the balance in deciding whether mitigating circumstances are "sufficient ... to warrant" a life sentence. We must resort to other indicia of the Legislature's intent.

The Code Construction Act provides:

"In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the:

(1) object sought to be obtained;

(2) circumstances under which the statute was enacted;

(3) legislative history;

\*　　\*　　\*　　\*　　\*　　\*

(5) consequences of a particular construction[.]"

V.T.C.A. Government Code, § 311.023. All of these extra-textual considerations militate against construing § 2(e) to authorize jury consideration of non-statutory aggravating circumstances.

First, the "object sought to be obtained" in adding § 2(e) was compliance with *Penry v. Lynaugh,* supra. In the wake of the decision in *Penry,* trial courts struggled with how to fashion a jury instruction that would authorize rejection of the death sentence on the basis of mitigating evidence that has no relevance to the statutory special issues. See *State v. McPherson,* 851 S.W.2d 846 (Tex.Cr. App.1992). Except for this one defect identified in *Penry,* Article 37.071 had always passed Eighth Amendment muster. Adding non-statutory aggravating circumstances to the mix was not constitutionally required, and might even create Eighth Amendment problems. See n. 1, *ante.* It is doubtful that, except to remedy the *Penry* defect, the Legislature intended to tamper with an otherwise tried and true capital punishment procedure. Given the "history" and "circumstances under which" § 2(e) was enacted, I doubt the Legislature gave any thought whatsoever to authorizing consideration of aggravating circumstances beyond those enumerated in § 2(b).

When the Legislature means for the jury to consider both aggravating and mitigating circumstances, it is capable of making its intent abundantly clear. In the same legislation that added § 2(e), the Legislature also added a jury instruction to guide deliberations on the § 2(b) special issues. Thus, Article 37.071, § 2(d)(1) now reads, in relevant part:

"(d) The court shall charge the jury that:

(1) in deliberating on the issues submitted *under Subsection (b) of this article,* it shall consider ... evidence of the defendant's background or character or the circumstances of the offense that *militates for* or mitigates against the imposition of the death penalty[.]" [4]

See Acts 1991, 72nd Leg., ch. 838, § 1, p. 2899, eff. Sept. 1, 1991. The absence of comparable language in § 2(e) suggests that if the Legislature thought at all about autho-

---

4. Emphasis supplied.

rizing the jury to consider non-statutory aggravating factors, it rejected the idea.

Turning to "the consequences of a particular construction," I fear that reading § 2(e) to contemplate jury consideration of non-statutory aggravators would create serious problems of implementation in the trial courts. For, as I have developed *ante,* even if the Legislature generally intended that the jury should weigh non-statutory aggravators against the defendant's mitigating evidence in its § 2(e) deliberations, we must presume the Legislature did not mean to authorize admission of any so-called "victim impact" evidence, at least not of the kind that *Booth* and *Gathers* had declared inadmissible. And presumably any "nexus" requirement we might impose on defendants as a predicate to jury consideration of mitigating evidence under § 2(e) would be imposed equally on the State before the jury would be permitted to consider evidence of non-statutory aggravators.[5] Distinguishing those aggravating circumstances that are admissible under § 2(e) from those that are not would prove a tortuous process indeed!

In short, the Legislature almost surely did not contemplate jury deliberation of non-statutory aggravating circumstances in the § 2(e) "selection" of those death-eligible defendants who should be spared that ultimate penalty. To construe § 2(e) to allow it anyway potentially threatens the constitutionality of our scheme, and would be a nightmare to implement. For these reasons I would

hold that § 2(e) authorizes jury consideration only of "the circumstances of the offense, the defendant's character and background, and [his] personal moral culpability" that cut *against* imposition of a sentence of death. It does not authorize consideration of non-statutory aggravating circumstances.[6]

### III.

The majority details the testimony at issue in this cause. In brief, the deceased's two sisters testified about the impact of the offense, and of the loss of their brother, upon their lives. They testified that their mother had been rendered an invalid who needed daily care and attendance. The mother herself testified to much the same effect. The deceased's father testified of his residual fear for himself and his family. See majority opinion at 121–122. Obviously none of this testimony was offered on the theory that "a jury might regard [it] as reducing the defendant's moral blameworthiness." Article 37.071, § 2(f)(4), supra. Nor does the State contend that the family's testimony relates to any of the special issues under § 2(b). Because I conclude that § 2(e) does not authorize jury consideration of evidence that increases the defendant's moral blameworthiness, I would hold that the testimony at issue in this cause was not relevant, and therefore not admissible, for that purpose. Rules 401 and 402, supra.[7] The trial court

---

5. We have already held that evidence of the deceased's bad character is not admissible as relevant to reduce a capital defendant's moral blameworthiness under § 2(e), at least not when the defendant was unaware of that bad character. *Alvarado v. State,* 912 S.W.2d 199, at 217 (Tex.Cr.App.1995) ("In our view ... a reasonable juror could not conclude that the victim's prior bad act (an assault on a police officer) tended to lessen the defendant's moral blameworthiness for the murder of that victim when the defendant was unaware of the victim's bad act."). I presume (perhaps naively) that this "nexus" requirement (for that is what it is) would be applied as well to evidence of the victim's good deeds and character, even if we were to declare that § 2(e) generally admits of non-statutory aggravators.

6. Such a holding would also *a fortiori* dispose of the numerous claims we have seen in recent months that Article 37.071, § 2(e) is unconstitutional because it fails to assign a burden of proof

as to non-statutory aggravating factors. If § 2(e) does not contemplate jury consideration of non-statutory aggravators in the first place, then surely the trial court could not err in failing to instruct the jury that the State has some burden to prove them. See, e.g., *Lawton v. State,* 913 S.W.2d 542, 557 (Tex.Cr.App.1995) ("We are confused by appellant's argument with respect to aggravating evidence under Article 37.071 § (2)(e) since it does not ask the jury to consider aggravating evidence."). But if we construe § 2(e) to allow for non-statutory aggravators, then we will have to entertain the merits of these claims that the statute is constitutionally defective for failing to assign a burden of proof.

7. Because I conclude the State's evidence is not relevant, I need not address whether the probative value of the evidence may have been substantially outweighed by its potential for unfair prejudice under Rule 403.

in this cause erred to admit it over appellant's objection.

The majority cites two non-capital cases for the proposition that evidence such as that admitted here has a bearing on personal moral culpability and is admissible at the punishment phase. See *Miller–El v. State,* 782 S.W.2d 892 (Tex.Cr.App.1990); *Stavinoha v. State,* 808 S.W.2d 76 (Tex.Cr.App. 1991). But in each of those cases we explicitly recognized that in the non-capital setting, "admissibility of evidence at the punishment phase ... is a function of policy rather than relevancy." *Miller–El,* supra, at 895. Because there are no issues of fact at the punishment phase of a non-capital felony trial, we have had to fall back upon determinations of what is "appropriate" for a jury to consider rather than what is, strictly speaking, "relevant." See *Murphy v. State,* 777 S.W.2d 44, at 62–63 (Tex.Cr. App.1988) (Plurality opinion on motion for rehearing). In *Miller–El* and *Stavinoha* we deemed any long-term physical and psychological effects upon the victims loosely to constitute "circumstances of the offense," and hence "appropriate" for the jury to consider in assessing a term of punishment within the statutory range.

The capital context, however, is different. The punishment assessed in a capital case is either life or death, and is governed exclusively by the jury's resolution of the Article 37.071 special issues. Only evidence relevant to those specific issues may be admitted over objection. Because I do not believe § 2(e) authorizes jury consideration of "circumstances of the offense" *qua* aggravating circumstances, I do not believe they are relevant to determining the defendant's death-worthiness in the "selection" stage of a capital punishment proceeding, *Miller–El* and *Stavinoha* notwithstanding.[8] That evidence of subsequent pain and suffering of surviving victims can be admitted at the punishment phase of a non-capital felony trial does not

control disposition of the issue before us in this capital case today.

Finally, I do not think we can say that the error in admitting the testimony in this cause was harmless beyond a reasonable doubt. Tex.R.App.Pro., Rule 81(b)(2). The Court has already said that it cannot review the jury's finding under § 2(e) for "sufficiency" of the evidence because the process of determining whether mitigating evidence calls for a life sentence is a value judgment, left to the unfettered discretion of the factfinder. The process, we have said, is an essentially inscrutable one, impervious to appellate review. See *Colella v. State,* 915 S.W.2d 834, at 845 (Tex.Cr.App.1995). I agree. *Id.,* at 848 (Clinton, J., dissenting). That being true, I do not see how we could meaningfully determine whether allowing the jury erroneously to consider non-statutory aggravating circumstances in the § 2(e) mix "contributed" to its negative answer. The burden, of course, is on the State. That means that when we cannot tell whether or not error contributed to the punishment assessed, we are obliged to remand the cause for a new punishment proceeding. See Article 44.29(c), V.A.C.C.P. It seems to me we are in no position to declare that error in allowing the jury to consider evidence that *increases* appellant's moral blameworthiness to be harmless beyond a reasonable doubt.

For the reasons given above, I would vacate the judgment of the trial court and remand the cause for a new punishment proceeding. Because the Court does not, I respectfully dissent.

---

**8.** I do not mean to suggest that aggravating circumstances of the offense are wholly inadmissible. Of course they are admissible to the extent they bear on the § 2(b) issues, i.e., whether the defendant will be a future danger, or whether he was at least aware that death would likely occur.

A capital defendant might be entitled to an instruction, however, that the jury's consideration of that evidence be limited to its consideration of the § 2(b) issues. Tex.R.Cr.Evid., Rule 105(a). See n. 3, *ante.*