# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00773-CR

**Anthony James Perez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT
### NO. CR-08-374, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Anthony James Perez of the offense of burglary of a habitation. *See* Tex. Penal Code Ann. § 30.02 (West 2003). The district court assessed punishment, enhanced by prior felony convictions, at 60 years' imprisonment. In two issues on appeal, Perez asserts that the State repeatedly violated a motion in limine related to extraneous offenses and claims that his trial counsel rendered ineffective assistance.[1] We will affirm the judgment of conviction.

---

[1] After Perez's appellate counsel filed a brief on Perez's behalf, Perez filed a "pro se motion to reject counsel on appeal," in which he criticizes counsel's brief and requests to represent himself. We overrule the motion. *See Martinez v. Court of Appeal*, 528 U.S. 152, 163 (2000) (holding that there is no federal constitutional right to self-representation on appeal); *Ex parte Thomas*, 906 S.W.2d 22, 24 (Tex. Crim. App. 1995) ("The right of self-representation is not a license to capriciously upset the appellate timetable or to thwart the orderly and fair administration of justice."); *Cormier v. State*, 85 S.W.3d 496, 498 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding that there is no state constitutional or statutory right to self-representation on appeal and that requests to proceed pro se on appeal should be decided on case-by-case basis).

**BACKGROUND**

The jury heard evidence that two houses in Kyle were burglarized on May 10, 2006. The first house was owned by Jimmy Spivey and his then-wife, Geraldine Gavrilov. Spivey testified that, when he returned home from running errands that day, he noticed that the door entering into his house from the garage was open, and his dog, who was normally kept on a leash in the garage during the day, was inside the house. Spivey further explained that he kept his garage door leading to the driveway partially open during the day so that the dog could go in and out. Suspecting a break-in, Spivey called the police. The officer who responded to Spivey's call was Officer Jason Dibble of the Kyle Police Department. When Officer Dibble arrived, he first observed that the door leading into the residence from the garage "had been kicked open, causing damage to the door and the doorjamb itself." After Dibble "cleared the house" to make sure no one was inside the residence, he and Spivey walked through the house to determine if any property had been stolen. Spivey testified that he did not observe anything missing. However, he noticed that the lid of his laptop computer, which was located in his bedroom, had been closed. When Gavrilov returned home later that afternoon, she noticed that a necklace and a cubic zirconia ring were missing from the upstairs bathroom. Gavrilov testified that she also observed pieces of wood missing from the door entering into the house from the garage, broken wood on the carpet inside, and something that looked "like a footprint" "right below the doorknob" where the door had been broken. The police did not obtain fingerprints from any objects in the house. Dibble testified that he did not dust the laptop for fingerprints because he did not want to risk damaging the computer, and he did not dust the garage entry door for fingerprints because it had been kicked open by foot rather than by hand.

2

The second house that was allegedly burglarized was owned by John Rogers. Rogers testified that his house was located on the same cul-de-sac as the Spiveys' house, although the houses were not adjacent to each other. According to Rogers, their houses were separated by another house that belonged to a woman named "Carol."[2] Rogers drew a diagram for the jury identifying the relative locations of the houses on the cul-de-sac.

Rogers testified that he was at home taking care of his infant son when someone rang his doorbell at around 1:00 p.m. on May 10, 2006. Rogers approached the front door, looked through the peephole, and saw a man standing on the porch. Rogers did not recognize the man and decided not to answer the door. Instead, he went to the family room and turned on the television. However, after a couple of minutes, Rogers thought that "it's kind of strange that somebody would be walking around the neighborhood at about that time of day," so he decided to look out his front window and see if the person was still around. Rogers recalled, "I saw the individual walking from my house through the street toward Mr. Spivey's house." Rogers thought that the individual was "just selling something," so he returned to the family room.

Approximately 20 minutes later, as Rogers was holding his baby and sitting in the family room watching television, he heard a chirping sound coming from his home alarm system. According to Rogers, that sound meant that a door or window had been opened. Rogers stood up, turned around, and saw the individual he had seen earlier standing in his kitchen. Rogers assumed that the man had entered through the sliding glass door in the kitchen, which was unlocked at the time.

---

[2] Rogers testified that he did not know Carol's last name.

Rogers testified that the man put up his hands and said, "Whoa, whoa." Rogers asked him, "Is there something I can help you with?" Rogers testified that he was "calm at the time," but the man "seemed a bit nervous, agitated that I was there." According to Rogers, the man explained that his friend had told him that he was "going to leave some golf clubs on the patio" and that "he could come pick them up." When Rogers asked the man who his friend was, the man told him, "His name is Tom." Rogers informed him that "there is no Tom that lives here," and, after he "conversed a little bit" with the individual, the man opened the sliding door and "ran through the backyard." Rogers also testified that, as they were talking, they were "maybe seven to eight feet apart from each other." Rogers described the man as "a small person," shorter than Rogers, and "in [the] range" of five-foot-nine to five-foot-ten inches tall. Rogers also recalled that the man was wearing dark clothing, had dark hair, and had "almost like an Italian skin tone, like an olive skin tone."

After the man left, Rogers walked to the front of the house and again looked through the front window. Rogers testified that he saw the man walking from his house to Carol's house, where there was a "black vehicle" parked either on or near Carol's driveway. Rogers testified that Carol lived by herself and owned a gold vehicle. Rogers added, "He actually went beyond the black vehicle out into the cul-de-sac. . . . It was as though he was talking on his cell phone, walking kind of in a circle and then went—got in the vehicle and at that point backed out" and "sped down the street." Rogers testified that he did not see anyone else in the vehicle. When asked to describe the vehicle, Rogers testified that he "just remember[ed] it being a black SUV" with "chrome wheels." When asked if he thought it might be "a Tahoe or something like that," Rogers answered, "At the time. I knew it was a GM type vehicle, SUV." Rogers explained that he was able to see "the

4

side view of the backside of the vehicle." He did not observe the vehicle's license plate number. A picture of a black Yukon SUV was admitted into evidence. When asked if the vehicle in the picture looked like the vehicle he saw in the driveway, Rogers testified, "Yes, sir." When asked why he thought it looked like the vehicle, Rogers explained, "I remember the chrome wheels and the way the wheel wells have—the black wheel well covers on them."

On July 28, 2006, Officer Phillip Kelly of the Austin Police Department performed a traffic stop on a black SUV for failing to signal a lane change. Officer Kelly described the vehicle as a "black GMC Yukon later discovered to be a 1996 model" with a Louisiana license plate. The driver of the vehicle was identified as Perez. When asked if Perez had "any warrants," Kelly testified, "Yes, he did."[3] Kelly then took Perez into custody and performed an inventory search of the vehicle. One of the items Kelly discovered was what he described as a "sports memorabilia Dallas Cowboy men's ring." However, Kelly explained that it was not the kind of ring one puts on a finger, but "more like a large scale ring" that could possibly serve as a paperweight. Kelly added that, in his mind, "[j]ust the size of it and then the Dallas Cowboy and the star in the middle stood out."[4]

The property that was seized from Perez's vehicle was turned over to Officer Mason Feinartz of the Austin Police Department. When asked if one of the objects stood out in his mind, Feinartz testified, "There was a unique ring. It was a Dallas Cowboys commemorative

---

[3] Kelly did not provide further testimony about the nature of the warrants. As we explain below when discussing Perez's motion in limine, at the time of the traffic stop, Perez had an outstanding warrant out of Travis County for burglary.

[4] A picture of the ring was admitted into evidence as State's Exhibit 1.

ring, fairly large." Feinartz also testified that it looked like a paperweight. On cross, Feinartz agreed with defense counsel's characterization of the object as "a paperweight in the shape of a ring." Feinartz also testified, "I wasn't sure if it was actually a Dallas Cowboys ring when I first observed it. It was very unique. I haven't seen anything like that." Later in his testimony, he added, "I've worked burglary investigations for five years while I was a detective, and I've never seen a ring like that. And I've seized numerous pieces of property via search warrants and such." When asked by defense counsel if the ring had any "identifying marks on it," Feinartz testified, "I don't remember any identifying marks. . . . Other than the Dallas Cowboys insignia and the star."

The Austin Police Department placed a public announcement on television about the ring. Geraldine Gavrilov saw this announcement and recognized the ring. Gavrilov testified that the ring, which she confirmed was actually used as a paperweight, was missing from her house, but she had not realized that it was missing until she saw the announcement. According to Gavrilov, the object had been located on a glass table in the hallway near the front door. Feinartz testified that Gavrilov contacted the police department on August 9, 2006, came into Feinartz's office that day, and "positively identified that ring." Feinartz then gave the ring to her.

After that, Feinartz testified, he contacted the Kyle Police Department and advised them that the ring had been claimed. He also informed them that the object had been seized from the vehicle Perez had been operating when he was arrested. Feinartz then prepared a photo lineup that contained a photograph of Perez and provided the lineup to Detective Jacob Luria of the Kyle Police Department.[5]

_____

[5] The lineup was admitted into evidence as State's Exhibit 5.

6

Detective Luria testified that he showed the lineup to John Rogers. Luria explained that the lineup contained six photographs of men that appeared to be of the same race, same general build, and same hair color. The photograph of Perez was on the top, upper right-hand corner of the lineup. According to Luria, when he showed the lineup to Rogers, Rogers identified Perez as the person who had been in his house. Luria testified, "I laid the photo spread down for him, and as soon as he looked at it, he pointed to—to Mr. Perez and said, That's him." When asked if Rogers seemed "pretty confident as to the person he was picking out," Luria testified, "Yes."

Rogers also provided testimony about the lineup. When asked how long it took him to identify Perez, Rogers testified, "Not very long." When asked if he had to study the lineup before identifying Perez, Rogers recalled, "Probably for, I think, maybe about 30 seconds or a minute. But I won't forget his face." When asked how confident he was that the person in the lineup was the person he had seen in his house, Rogers testified, "Absolutely confident." Rogers then identified Perez in court as the person who had been in his house.

Perez was indicted on seven counts of burglary of a habitation.[6] Defense counsel moved for severance, and the State elected to proceed with only the first count of the indictment involving the Spivey home.[7] The jury found Perez guilty of committing that burglary, and the

---

[6] In addition to the homes of Jimmy Spivey and John Rogers, Perez was accused of burglarizing the homes of five other individuals in Hays County. Each of the seven counts involved a different home.

[7] Because the count involving the burglary at Rogers's home had been severed, defense counsel objected to the introduction of any evidence related to that offense. However, the State argued that, because the two burglaries occurred at around the same time and place, the evidence involving the Rogers burglary was essential to understanding the context and the circumstances of the events surrounding the burglary at Spivey's home. The district court overruled the objection, and Perez does not complain of that ruling on appeal.

7

case proceeded to punishment. The evidence at the punishment hearing included testimony from other alleged victims of Perez. At the conclusion of the punishment hearing, Perez was sentenced to sixty years' imprisonment. This appeal followed.

## ANALYSIS

**Motion in limine**

Prior to trial, Perez filed a motion in limine to exclude evidence of extraneous offenses. These offenses included burglaries allegedly committed by Perez in Travis County.[8] At a pretrial hearing on the motion, defense counsel explained his concern about the evidence:

> [S]ometime in July 2006, [Perez] apparently became a suspect in some burglaries that are being investigated by the Austin Police Department.
>
> At some point they had obtained warrants for his arrest. Apparently he had been, they say, identified in connection with some of these other burglaries and a black SUV.
>
> On July 28th he was pulled over by an Austin patrol officer driving a black SUV. We learned that there were two outstanding warrants for burglary from Travis County. He was arrested at that time, and some property was found in his vehicle, including an item which, according to the reports in any event, was later identified by [Gavrilov], one of the victims in this case, as having come from her house during the burglary back on May the 10th.
>
> I understand the relevance of that evidence. I'm just—what I'm concerned about is then we start getting into—unless it's going to be phrased fairly carefully . . . is how that evidence would come in without sort of—if not just directly stating, extremely

---

[8] The Travis County cases resulted in convictions that have recently been affirmed by this Court on appeal. *See Perez v. State*, No. 03-07-00606-CR, 2009 Tex. App. LEXIS 5689 (Tex. App.—Austin July 23, 2009, no pet. h.) (mem. op., not designated for publication); *Perez v. State*, No. 03-08-00131-CR, 2009 Tex. App. LEXIS 5457 (Tex. App.—Austin July 16, 2009, no pet. h.) (mem. op., not designated for publication).

8

strongly inferring that this defendant was also responsible for a whole bunch of other crimes which aren't on trial here and which are irrelevant. That's—that's my concern, frankly.

The prosecutor acknowledged defense counsel's concern and then explained how he was planning to address it during trial:

> But I was thinking that if I ask [the arresting officer], you know, you were aware of the existence of this vehicle and a person that was driving it, and he'll say—you know, he'll testify to that and that he watched a traffic offense and that he pulled the gentleman over, and he verified that there was an active warrant and don't ask any more questions about that. Just say that he took the suspect, defendant, into custody and, upon an inventory of the vehicle, was able to find, among all of the things in there, an item that was later claimed by a victim in Kyle.
>
> . . . .
>
> And I think if I ask it that way, the patrol officer will be admitting, "Yes, I did arrest him because there was a warrant," but the jury will not know anything about what the warrant is about, and it will minimize it, because we have to give the jury some reason that this guy was pulled over and arrested.

The prosecutor also explained another way the Travis County offenses could come up during trial:

> Then we're going to have a photo lineup, too . . . that Austin put together and provided to Kyle. And I was going to ask the Austin detective—or get the Austin detective to say he was performing an investigation, the defendant was a possible suspect, and the photo lineup that he created, he provided to Kyle.
>
> . . . .
>
> The Kyle PD officer goes out and shows our victim the photo lineup, and the victim . . . says, Yeah, that's the guy in the photo lineup.
>
> . . . .

9

So that's really—so we've got to skirt around that whole Austin issue, but we still have to acknowledge why he was stopped and that there was some stolen property.

I guess we could just go with stopping for traffic offenses.

The district court advised the prosecutor, "You can do all that if you're careful with the witness. And in my opinion, you should do it without any mention of the burglaries. And you can say it was a traffic stop. . . ." The prosecutor then asked, "What about the warrant?" The district court replied, "Why do you need to say there's a warrant?" After further discussion, the district court concluded, "Don't say anything but there was a traffic stop, and we found these items."

The district court also addressed the concern about the lineup:

[The Court]: You can say there was a Hays lineup. You don't have to say how it was put together, who put it together. Just say that the authorities in Kyle or Hays County had the lineup and they picked him out. You don't have to say it came from Austin because he's suspected in other burglaries. . . .

[Prosecutor]: Judge, the AP—the APD officer is the one that's actually going to say the defendant is the one in the photo lineup because the Kyle PD officer just got an email and it said, you know, Number 3, top right, is the suspect.

[The Court]: So Mr. Rogers went to Travis County?

[Prosecutor]: To Kyle. But the Kyle police got an email from Travis County. So Kyle really doesn't know who anybody is. They just got the photo lineup.

. . . .

[The Court]: I don't see any problem just to say that the Kyle officer had a—had a lineup.

10

[Defense]:       I agree with [the State] . . . .  At some point somebody is going to have to say that the picture in the lineup that was kicked out by Mr. Rogers was in fact a picture of the defendant.

[The Court]:    Well, you can still—you can still stipulate to that if you want to if you—I'm going to allow it one way or another without the other burglary.

[Defense]:       Yeah.  I was kind of guessing that might be the case.

[The Court]:    Right.  So I suggest you work it out among yourselves.  If you can do it by stipulation—I'm going to allow it one way or another.

. . . .

[Prosecutor]:   I want [the Austin officer] to be able to point the defendant out as driving the vehicle and the suspect in the photo.  But, I mean, shoot, if [defense counsel] will stipulate to it, I'm fine with that.

[Defense]:       I'll give that some thought.

[The Court]:    Y'all think about it.  We'll decide—or I'll decide in the morning about 15 till 9:00.  But I think you ought to be able to do it without saying he's a suspect anywhere else.  Just say there was a traffic stop and the officer testify, "I'm with Austin PD, and I performed this, and this is the defendant."  And you don't have to say he's a suspect or anything. . . .

[Prosecutor]:   That's—that's a good point.  So we could have the detective say, after the victim from Kyle came up to Austin and claimed this piece of property, I took a photo of the gentleman who we caught with it and sent it to Kyle in a photo lineup.

[The Court]:    That's easily done.  Y'all do that.

[Prosecutor]:   Is that okay?

[Defense]:       That makes sense.

[Prosecutor]:   I mean, I can call the detective, and you can be happy and nothing about extraneous offenses.

11

[Defense]:      Well, I didn't say I—I was not stipulating to being happy about anything.

. . . .

[The Court]:    Recess until 9:00 in the morning.

The record does not reflect any further discussion on the motion in limine the following morning.

In his first issue, Perez asserts that the State repeatedly violated the motion in limine. According to Perez, the jury was made aware of the Travis County offenses when: (1) "the State mentioned the outstanding warrant and the arrest"; (2) "the State disclosed that the Austin Police Department had prepared the photo lineup"; and (3) "several of the State's questions and the officer's responses thereto made it clear that the Austin Police Department had named Perez as a suspect in other pending cases." Perez then goes on to list numerous instances throughout the trial when he asserts the State violated the motion in limine, either during argument or in the questions the State asked of its witnesses and the answers that were elicited.

In response, the State argues that Perez failed to preserve error. In the alternative, the State argues that the extraneous offense evidence was admissible or, if it was inadmissible, that any error in its admission was harmless.

We first observe that the district court's ruling on the motion in limine is unclear from the record. There is no written ruling on the motion, and at no point during the pretrial hearing did the district court expressly grant the motion. While it seems that the district court agreed that the State should refrain from mentioning anything about the Travis County warrants or that Perez was a suspect in the Travis County burglaries, the extent of the district court's ruling regarding exactly

12

what the State could mention concerning the APD's involvement in creating the photo lineup is unclear. In fact, the district court stated that it would "decide" the issue the following morning, after the parties "thought about it" some more and determined if defense counsel would stipulate to the identity of Perez in the lineup. However, we do not know what the trial court decided the following morning, because no further hearing on the motion in limine is in the record.

Moreover, even if Perez is correct that the district court completely prohibited the State from mentioning anything about the Austin Police Department's investigation, and that the State violated the district court's instructions on the matter, no error has been preserved for review. We have found that, in each instance Perez mentions in his brief, trial counsel made no objection to the State's alleged violation of the motion in limine. Perez does not dispute this. Rather, he expresses his belief that what he characterizes as trial counsel's "global objection" at the pretrial hearing and the district court's "explicit instructions" concerning the motion "would carry forward through trial without the need for any contemporaneous objection." We disagree.

It is well settled that motions in limine do not preserve error. *See Roberts v. State*, 220 S.W.3d 521, 533 (Tex. Crim. App. 2007); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003); *Romo v. State*, 577 S.W.2d 251, 252 (Tex. Crim. App. 1979). This is true whether the motion is granted or denied. *Willis v. State*, 785 S.W.2d 378, 384 (Tex. Crim. App. 1989); *Harnett v. State*, 38 S.W.3d 650, 655 (Tex. App.—Austin 2000, pet. ref'd). "A ruling on a motion in limine does not purport to be one on the merits but one regarding the administration of the trial." *Harnett*, 38 S.W.3d at 655. As the court of criminal appeals has explained,

13

The violation of a motion in limine may entitle a party to relief, but any remedies available with regard to such a violation are with the trial court. If its order has been violated, the trial court may apply the sanctions of contempt or take other appropriate action. But for error to be preserved on appeal with regard to the admission of inadmissible evidence objection thereto should be made at the time the evidence is offered.

*Brazzell v. State*, 481 S.W.2d 130, 131 (Tex. Crim. App. 1972). Thus, "'[f]or error to be preserved with regard to the subject matter of [a] motion in limine, it is absolutely necessary that an objection be made at the time when the subject is raised during the trial.'" *Wilkerson v. State*, 881 S.W.2d 321, 326 (Tex. Crim. App. 1994) (quoting *Gonzales v. State*, 685 S.W.2d 47, 50 (Tex. Crim. App. 1985)); *see also* Tex. R. Evid. 103(a)(1) (requiring party to timely object when evidence is admitted); Tex. R. App. P. 33.1(a)(1)(A) (requiring timely and specific objection stating grounds with sufficient clarity to advise trial court of basis for complaint).

There are only two exceptions to the contemporaneous-objection requirement, and neither is applicable here. First, a party may obtain a "running objection" to the evidence. *See Ford v. State*, 919 S.W.2d 107, 113 (Tex. Crim. App. 1996); *Ethington v. State*, 819 S.W.2d 854, 858-59 (Tex. Crim. App. 1991). However, the record does not reflect that Perez ever made or obtained a running objection to the admission of the evidence of which he now complains. The second exception is provided by rule 103: "When the court hears objections to offered evidence out of the presence of the jury and *rules that such evidence be admitted*, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections." Tex. R. Evid. 103(a)(1) (emphasis added). Perez claims that this exception applies to him because he objected to the evidence in a hearing outside the presence of the jury and obtained

a ruling from the district court. However, rule 103(a)(1) contemplates a situation in which a trial court has *overruled* a party's objection at the hearing and *admitted* the complained-of evidence, i.e., when a party obtains an adverse ruling on a motion to exclude or suppress evidence. *See, e.g.*, *Geuder v. State*, 115 S.W.3d 11, 14 (Tex. Crim. App. 2003); *Lopez v. State*, 230 S.W.3d 875, 883 (Tex. App.—Eastland 2007), *aff'd*, 253 S.W.3d 680 (Tex. Crim. App. 2008). Here, the record reflects that the district court, if anything, ruled in Perez's favor and *excluded* evidence related to the Travis County offenses. Thus, the exception provided by rule 103 does not apply in this case.

We conclude that Perez has presented nothing for review.

## Ineffective assistance

Also in his first issue, Perez argues in the alternative that, if we find that trial counsel failed to preserve error regarding the admission of the extraneous-offense evidence, we should conclude that this failure constituted ineffective assistance of counsel.

We evaluate claims of ineffective assistance of counsel against the standard set forth in *Strickland v. Washington*. *See* 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 774 (Tex. Crim. App. 1999). In deciding a claim of ineffective assistance of counsel, we must determine whether an attorney's performance was deficient and, if so, whether that deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). The appellant has the burden to establish both of these prongs by a preponderance of the evidence. *See Jackson v. State*, 973 S.W.2d 954, 956 (Tex. Crim. App. 1998). Absent both showings, we cannot conclude that there has been a breakdown in the adversarial process that renders the result of a trial unreliable. *Thompson*, 9 S.W.3d at 813.

15

Deficient performance is prejudicial when there is a reasonable probability that the outcome of the proceeding would have been different but for the attorney's unprofessional conduct. *Strickland*, 466 U.S. at 694; *Thompson*, 9 S.W.3d at 812. A reasonable probability is a probability sufficient to undermine confidence that the adversarial process can be relied upon to have produced a just result. *Strickland*, 466 U.S. at 694; *Thompson*, 9 S.W.3d at 812. On this record, even if we were to assume that trial counsel's performance was deficient, we cannot conclude that Perez has met his burden of proving by a preponderance of the evidence that there is a reasonable probability that the outcome of the proceeding would have been different but for the deficient performance.

The evidence in this case included identification testimony from an eyewitness who saw and spoke with the alleged burglar around the time the crime occurred. John Rogers testified that a man came to his house on the day of the burglary, rang the doorbell, and when no one answered, walked toward Spivey's house. Shortly thereafter, Rogers discovered that same man in his kitchen. Rogers was able to describe the man's physical features, including that he was "a small person," shorter than Rogers, "in [the] range" of five-foot-nine to five-foot-ten inches tall, and was wearing dark clothing, had dark hair, and had "almost like an Italian skin tone, like an olive skin tone." Rogers's description of the man did not fit Perez's description exactly—the jury heard evidence that Rogers did not believe Perez to be Hispanic, even though he was; that Perez was possibly closer to five-foot-six or -seven inches tall; and that Rogers did not observe that the person in his house had any moles on his face, even though Perez, at the time of the burglary,

16

apparently had a mole on his left cheek.[9]  However, Rogers testified that he was "calm" during the encounter, was "maybe seven to eight feet" away from the man while they were speaking, and would not "forget his face."  Furthermore, Rogers testified that he had to study the lineup for only "about 30 seconds or a minute" before identifying Perez and that he was "absolutely confident" that the person he identified in the lineup was the same person he saw in his house.  Detective Luria, the officer who conducted the lineup, testified similarly about Rogers's confidence in making the identification.  Additionally, Rogers saw the person drive away in a black SUV that Rogers testified looked similar to the SUV that Perez was driving when he was arrested.  Rogers testified that he remembered the chrome wheels and the black wheel-well covers on the vehicle.

Moreover, property that was allegedly stolen from Spivey's house was found in Perez's SUV.  The jury heard evidence that this property, which was described as "a Dallas Cowboys commemorative ring, fairly large," was "very unique."  It was not the type of ring worn on one's finger but used as a paperweight.  Officer Feinartz testified, "I've worked burglary investigations for five years while I was a detective, and I've never seen a ring like that."  Although, as Perez observes, the ring did not have any "identifying marks" on it such as a serial number, when Gavrilov claimed the ring, Feinartz testified that Gavrilov "positively identified that ring" as hers.

In summary, this is not a case in which we can conclude that trial counsel's failure to object to extraneous offense evidence undermines our confidence in the outcome of the proceeding.  Thus, we cannot conclude that Perez has satisfied the second prong of *Strickland*.  *See,*

---

[9] We note that the State introduced evidence that Perez had this mole removed at some point after he was arrested.

*e.g.*, *Hathorn v. State*, 848 S.W.2d 101, 120 (Tex. Crim. App. 1992) (concluding that, even though trial counsel failed to object to admission of extraneous offenses, appellant "has simply not met the heavy burden required by *Strickland*" when court considered, among other things, "the strength of the State's case"); *Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984) (after "viewing the evidence as a whole," finding that "the prejudicial impact" of admission of extraneous offenses "was not of a sufficient degree to constitute an unfair trial").

We overrule Perez's first issue.

In his second issue, Perez claims that he received ineffective assistance when the attorney representing Perez in his appeal of the Travis County burglary cases provided advice regarding punishment that contradicted the advice of Perez's trial counsel in this case. According to Perez, trial counsel in this case advised him that the district court had the authority to run his Hays County sentence consecutive to his Travis County sentences. Appellate counsel in the Travis County cases, however, allegedly advised Perez that the district court did not have the authority to stack the sentences while the appeals in the Travis County cases were pending. Perez asserts that this contradictory advice prevented him from accepting the State's plea offer of thirty-five years to run concurrently with his sentences in the Travis County cases.[10]

Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005) (citing *Thompson*, 9 S.W.3d at 813). Hence, in most ineffective assistance

---

[10] The record reflects that the State withdrew this offer during the punishment hearing after Perez indicated that he had received contradictory advice about the sentence.

claims, a writ of habeas corpus is essential to gathering the facts necessary to adequately evaluate such claims. *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). The record in this case is inadequate to determine the effectiveness of the appellate counsel who advised Perez in the Travis County cases. Furthermore, "counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (citing *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003)). Perez's Travis County appellate counsel has not been afforded that opportunity.

We overrule Perez's second issue.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   August 21, 2009

Do Not Publish